COMMISSIONER OF INSURANCE, receiver, *vs.*
MASSACHUSETTS INSURERS INSOLVENCY FUND.

Suffolk.    September 14, 1977. — December 6, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Insurance,* Commissioner of Insurance, Insolvency of insurer.    *Massachusetts Insurers Insolvency Fund.    Unjust Enrichment.*

Under the provisions of G. L. c. 175D, the Massachusetts Insurers Insolvency Fund was not required to pay for goods and services furnished by adjusters, appraisers, attorneys, and others to an insurer prior to its insolvency, even though the Fund used those goods or the products of those services in settling the insolvent insurer's covered claims. [802-805]

Nothing in G. L. c. 175D imposed liability on the Massachusetts Insurers Insolvency Fund to pay for claim reports prepared at the direction of the Commissioner of Insurance, acting as a temporary receiver, nor did it authorize the Commissioner to commit the Fund to pay pre-insolvency obligations. [805-807]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on August 20, 1974.

The case was reserved and reported by *Kaplan,* J., on a statement of agreed facts.

*Edward T. Dangel, III   (John G. Hartnett* with him) for the plaintiff.

*Joseph C. Tanski* for the defendant.

*Harry H. Caviston   (Franklin S. Prizer* with him) for the interveners.

WILKINS, J.    On the central issue in this case, we hold that the Massachusetts Insurers Insolvency Fund (Fund)

is not liable to adjusters, appraisers, attorneys, and others who furnished goods or services to Rockland Mutual Insurance Company (Rockland) prior to its insolvency, even if the Fund used those goods or the product of those services in settling Rockland's affairs.

On July 10, 1974, Rockland, a mutual insurance company incorporated under the laws of the Commonwealth, was adjudged to be insolvent, and the Commissioner of Insurance (Commissioner) was appointed permanent receiver. In early August, 1974, the Fund entered Rockland's premises and undertook to settle, investigate, negotiate, and defend claims by or against Rockland's policyholders pursuant to the Fund's statutory obligations under G. L. c. 175D. The Fund is a statutorily mandated, nonprofit, unincorporated association of all insurers writing certain kinds of direct insurance in the Commonwealth. See G. L. c. 175D, §§ 1 (5), 2, 3.[1] Chapter 175D prescribes a procedure for the formation and maintenance of the Fund in order that it will be available to settle certain unpaid claims which arise out of and are within the coverage of an insurance policy issued by an insolvent insurer. See G. L. c. 175D, §§ 3, 4, 5 (1) (*a*), 6. The Fund's obligations and expenses are assessed to the insurers belonging to the Fund. G. L. c. 175D, § 5 (1) (*c*). The net amounts which insurers must pay to the Fund, in response to assessments by the Fund, must be reflected in future rates. G. L. c. 175D, § 13. We are advised that this is the first insolvency of an insurer in which the Fund has been involved.

The Commissioner, as receiver, argues that the Fund must pay for its use of reports, estimates, appraisals, and other information prepared and delivered to Rockland prior to its insolvency by attorneys, independent claims adjusters, physical damage appraisers, and others. The Fund denies any such obligation. On August 20, 1974, the Commissioner filed a complaint seeking a determination

---

[1] Chapter 175D does not apply to life, accident and health, workmen's compensation, title, surety, disability, credit, mortgage guaranty, or ocean marine insurance. G. L. c. 175D, § 2.

of this issue. The receiver and the Fund stipulated that the Fund would use various documents in Rockland's claim files, without prejudice, while this case was being resolved. Thereafter, various organizations and individuals who had furnished services or had sold supplies to Rockland were permitted to intervene and to file complaints setting forth the nature of their claims and the amounts allegedly due.[2]

The Fund filed a motion for summary judgment, supported by affidavits. The Commissioner and his counsel filed counteraffidavits. The motion for summary judgment was heard by a single justice of this court, and he reported the case, without decision, to the full court on a statement of agreed facts. The statement of agreed facts purports to be an agreement as to all the material facts, but it is not. There are unresolved issues of fact which would prevent a final determination of each of the claims, if the Fund were liable to the several claimants. However, the agreement as to facts contains sufficient information to permit us to determine whether the Fund's motion for summary judgment should be allowed, the basic issue the single justice reported to us.

In our discussion of the Fund's obligation to certain of Rockland's pre-insolvency creditors, it is important to note what is not involved in this case. We are not concerned with whether these creditors have rights against the receiver or any assets held by him, nor with whether the receiver, with or without prior court approval, might prop-

---

[2] Almost all the interveners seek payment for reports and other documents submitted by them prior to Rockland's insolvency, and used by the Fund in handling claims. One claimant furnished color coded claim folders to Rockland which the Fund has used. The record does not support the assertion made on behalf of one intervener (Mr. Louis H. Cohen) that he furnished services to the Fund after Rockland's insolvency. We need pass on the Fund's post-insolvency dealings with persons furnishing services to the Fund only in connection with the claim of Gordon Boyd & Co., Inc., which alleges that it performed services after Rockland's insolvency pursuant to an understanding made with the Commissioner when he was temporary receiver of Rockland. We shall deal with the Boyd claim separately toward the end of this opinion.

erly allow payment of such creditors in full from the assets of Rockland.[3] Nor are we concerned with whether the Fund may look to the assets of the insolvent insurer, held by the receiver, for reimbursement for claims paid and for expenses incurred.[4] In addition, we need not decide whether the Fund has authority to pay claims of such creditors voluntarily, to bind its members to reimburse it for those expenditures, and to commit the Commissioner to permit recovery of such amounts in future rates. And, we are not presented with the question whether the Fund has a right to the claim files of insolvent insurers over the objection of the receiver.[5] By stipulation, the Fund and the receiver avoided an impasse over the Fund's right to

---

[3] The record shows that, in an earlier insurance company insolvency, certain claims for services rendered prior to insolvency were paid, apparently in full, by leave of court, where the work product was used by the receiver and his counsel in the liquidation proceedings. In his brief, the receiver states that payment of such expenses "would probably constitute a preference and as such would be illegal." The propriety of such payments apparently has never been decided by this court. The argument of the receiver and interveners in this case is, in effect, that G. L. c. 175D has given lawful preferential status (but against the Fund) for certain pre-insolvency creditors of an insolvent insurer.

[4] The Fund is assigned the rights of certain persons who recover from it pursuant to G. L. c. 175D, and the receiver must recognize any amount paid and grant "against the assets of the insolvent insurer, priority equal to that [to] which the claimant would have been entitled in the absence of [G. L. c. 175D]." G. L. c. 175D, § 8 (1) and (2), inserted by St. 1970, c. 261, § 1. It is questionable whether the Fund may look to the assets of the insolvent insurer for reimbursement, in full or in part, for the expenses it incurs in settling the claims of insolvent insurers. Expenses of this character were reimbursable formerly by the receiver as claims entitled to priority. Cf. *Jones* v. *Arena Publishing Co.,* 171 Mass. 22, 29 (1898). If the Fund must absorb the expenses of settling claims against Rockland without recourse to Rockland's assets in the receiver's hands, Rockland's business creditors will benefit from the statutory diversion of the obligation from Rockland's assets to the Fund.

[5] The plan of operation of the Fund, approved by the Commissioner under G. L. c. 175D, § 6 (1) (*a*), impliedly acknowledges that the Fund might not have an unfettered right to the records of the insolvent insurer and may need the receiver's cooperation in obtaining control of those records.

Rockland's records.[6] The receiver's complaint seeks a declaratory judgment concerning the Fund's obligation to pay certain of Rockland's pre-insolvency creditors. That question is the principal one before us.

1. The receiver and the interveners advance several theories under which the Fund is said to be liable to Rockland's pre-insolvency creditors whose goods or services have been used by the Fund in fulfilling its statutory obligations. They assert that G. L. c. 175D requires the Fund to satisfy such creditors and that, in order to make the statutory scheme operate, the receiver must have authority to direct the Fund to pay such creditors. The receiver also argues, but most briefly, that the Fund is liable to the interveners on a theory of unjust enrichment.

Chapter 175D does not mandate that the Fund pay any pre-insolvency creditor of Rockland, apart from those having covered claims arising out of and within the coverage of an insurance policy issued by Rockland. Section 5 (1) (a) of G. L. c. 175D states that the Fund is "obligated to the extent of the covered claims against the insolvent insurer existing prior to the declaration of insolvency" and to the extent of certain post-insolvency covered claims.[7] See G. L. c. 175D, § 5 (1) (b), to the same

---

[6] By the stipulation, the receiver did not concede the Fund's right to Rockland's records in his possession. This issue is unresolved, was not raised by the complaint or answer, and has not been briefed as an issue. Unless the Fund has a statutory right to an insolvent insurer's records relating to unsettled claims, or, unless the receiver concludes that he will turn those records over voluntarily (perhaps with court approval), the relative rights of the Fund and the receiver to Rockland's claim files may turn simply on whatever agreement they may make.

[7] A covered claim is defined in G. L. c. 175D, § 1 (2), as "an unpaid claim, including one for unearned premiums, which arises out of and is within the coverage of an insurance policy to which this chapter applies issued by an insurer, if such insurer becomes an insolvent insurer and (a) the claimant or *insurer* is a resident of the commonwealth; or (b) the property from which the claim arises is permanently located in the commonwealth" (emphasis supplied). By St. 1975, c. 570, § 1, the word "insurer," italicized above, was changed to "insured."

None of the interveners has a covered claim which he can assert against the Fund. Although many policies of insurance include a duty to defend any claim falling within the policy coverage, the interveners,

effect. Chapter 175D places no other explicit obligation on the Fund.

The Fund is directed by § 5 (1) (*c*), as amended by St. 1975, c. 341, § 4, to assess its members "the amounts necessary to pay the obligations of the Fund and *the expenses of handling covered claims subsequent to an insolvency . . .* and *other permissible expenses* incurred under this chapter" (emphasis supplied). This language imposes no obligations on the Fund to pay pre-insolvency creditors of an insolvent insurer; it recites the scope of potential obligations of the Fund's member insurers to it. "Permissible expenses" refers to expenses which the Fund may incur in fulfilling its functions, but those words neither define what those expenses are nor designate any particular obligation as mandatory.[8] Similarly, the words "expenses of handling covered claims subsequent to an insolvency" refer only to expenses incurred by the Fund but do not define any particular expenses as mandatory obligations of the Fund. In any event, these words do not include the interveners' claims, which arose from services bargained for by the insolvent insurer prior to its insolvency.

We find nothing in G. L. c. 175D to indicate a legislative intent that the Fund must pay for goods and services furnished to an insolvent insurer prior to its insolvency, where the Fund uses those goods or the product of those services in handling claims. If such claims were an obligation of the Fund, policyholders of insurers belonging to the Fund would have to pay increased premiums so that the Fund's members could recover amounts they paid to the Fund to cover those obligations. G. L. c. 175D, § 13. Numerous business creditors could establish that their goods

---

who may have been, and often no doubt were, acting for Rockland in fulfilment of Rockland's duty to defend claims, do not thereby have a claim under any Rockland policy.

[8] For example, if the Fund, in its reasonable business judgment, chooses to pay an insolvent insurer's pre-insolvency obligation to a particular creditor in order to obtain his assistance in completing investigations and reports in process at the time of insolvency, such an expense might be a "permissible" one under § 5 (1) (*c*).

or their services were used by the Fund in its claims handling. If the Legislature had intended that the Fund initially, and the insurance-buying public ultimately, hold certain creditors of an insolvent insurer harmless from bad debt losses, it could have said so explicitly, as it did regarding certain claims made under policies issued by an insolvent insurer.[9] See G. L. c. 175D, § 1 (2), note 7 *supra.*

Chapter 175D addresses the problem of unpaid claims arising under a policy of insurance issued by an insolvent insurer. Statute 1970, c. 261, by which G. L. c. 175D was inserted by the General Laws, is entitled "An Act establishing an insurers insolvency fund for the protection of the policyholders." In enacting G. L. c. 175D, the Legislature was not concerned with the unpaid business creditors of an insolvent insurer. Chapter 175D does not give the least indication of an intention to improve the position of unpaid business creditors of an insolvent insurer.[10]

The statutory pattern of G. L. c. 175D presents an

---

[9] The parties have referred to lower court decisions in other jurisdictions. These decisions generally turned on whether the claim at issue was a "covered claim" under guaranty fund statutes like, but not identical to, G. L. c. 175D. All but one of the decisions rejected the arguments of pre-insolvency creditors who handled claims on behalf of subsequently insolvent insurers. The decision which went the other way is not well reasoned. Only one of these decisions is reported officially. *Cooper Claims Serv., Inc.* v. *Arizona Ins. Guar. Ass'n.,* 22 Ariz. App. 156 (1974). However, the interveners are not arguing that their claims are a "covered claim," as defined in G. L. c. 175D, § 1 (2). None of the cases referred to us from other jurisdictions, except the Arizona case, cited above, dealt significantly with the question whether a guaranty fund's use of materials prepared and delivered prior to insolvency resulted in the fund's liability to pre-insolvency creditors. The Arizona court rejected the claimants' argument that the guaranty fund was "unjustly enriched by utilizing the claims files of the insolvent insurers which had been enhanced by the uncompensated work product of the Adjusters prior to insolvency." *Id.* at 157.

[10] It is true, as observed in note 4 *supra,* that business creditors may benefit incidentally from the operation of the Fund. The Fund assumes obligations of claims administration which, but for the Fund, presumably would be priority claims against any remaining assets of the insolvent insurer. If the Fund is not entitled to make claims against the assets of the insolvent insurer for its loss adjustment expenses, a point we do not decide, the demands against the assets of the insolvent insurer will be lessened and creditors will benefit.

inhospitable environment for any claim against the Fund based on unjust enrichment. The interveners do not rely on such a claim, and the receiver advances the theory in the briefest of arguments.

The circumstances of this case lack the essential qualities of unjust enrichment. See *National Shawmut Bank* v. *Fidelity Mut. Life Ins. Co.*, 318 Mass. 142, 145-146, 150 (1945). We see no injustice or basic unfairness in the Fund's use of the intervener's pre-insolvency work product, and thus the Fund is not unjustly enriched. The Fund has a statutorily imposed duty to settle claims against Rockland. The most the Fund can hope for is that it will be able to recoup its expenses in handling those claims. It is true that, by using assets of the insolvent insurer (not the interveners' assets), the Fund indirectly has the benefit of the interveners' services, and, as a result, the Fund (and ultimately the consuming public who must sustain any loss) may be saved certain expenses. However, as a matter of fairness, the involvement of the Fund to settle claims against Rockland creates no greater equities in favor of Rockland's business creditors than they had under prior law. A receiver who used the work product of a pre-insolvency creditor did not become liable thereby to that creditor on a theory of unjust enrichment, or on any other theory. It is no more unjust for the Fund to utilize the interveners' work product without paying for it than it is for any receiver to utilize the claim files of his insolvent in settling its affairs. In each instance, the claimant, as a creditor of the insolvent, may look to any funds held by the receiver.

2. We consider next the claim of Gordon Boyd & Co., Inc. (Boyd), that it is entitled to payment for claim reports it allegedly prepared after Rockland's insolvency. On June 28, 1974, the then Commissioner wrote to Boyd agreeing to have Boyd undertake adjustment of losses that might be referred to it by a Mr. Sheehan, who apparently was handling Rockland's claims. The Commissioner, who was then temporary receiver of Rockland, wrote that "[a]ll normal procedures can be employed short of actual settle-

ment." He added that "once the Receivership is permanent the Insolvency Fund will step in and be obliged to meet claim costs." There is no showing that the Fund was aware of this letter at any time. The Commissioner was appointed permanent receiver on July 10, 1974.

Boyd seeks to recover for services it claims to have rendered both before and after insolvency. The record does not disclose what services Boyd rendered between the date of the Commissioner's letter (June 28) and the date of his appointment as permanent receiver (July 10). The Fund concedes that it used reports which Boyd claims to have prepared after Rockland's insolvency. Boyd's complaint as intervener alleged that the Commissioner was acting as the Fund's agent, and, by its answer, the Fund denied the allegation. In an affidavit in support of the Fund's motion for summary judgment, the chairman of the Fund's board of directors stated that he did not authorize the Commissioner to act in any capacity for the Fund. We need consider separately only that portion of Boyd's claim which deals with services rendered in response to the Commissioner's letter.

Chapter 175D does not make the Fund liable for obligations incurred by a temporary receiver, nor does it authorize the Commissioner to commit the Fund to pay pre-insolvency obligations. We are not concerned here with Boyd's right to recover against assets held by the receiver. See *Fauci* v. *Mulready*, 337 Mass. 532, 536-537 (1958). The record shows that the Commissioner did not have actual authority to bind the Fund to pay Boyd for its services, and it fails to disclose any basis for a claim that the Commissioner had apparent authority to bind the Fund.

The receiver argues that the hiring of Boyd was a "logical and proper" act because of the many claims then pending against Rockland. That fact may have a bearing on the receiver's obligation to Boyd, but it does not make the Fund liable. The receiver argues further that assets of an insolvent insurer will be wasted if those assets must

be used to pay people who render post-insolvency services where the Fund fails to perform its obligations seasonably. The record does not disclose that the Fund delayed unreasonably in assuming its obligations. If it had delayed its involvement unreasonably, the Fund should be liable to the receiver for claims adjustment expenses authorized by the receiver during the period of unreasonable delay. There is no basis for holding the Fund liable for obligations not incurred by it, assumed by it, or imposed on it by statute.

Although what we have said resolves all the issues argued to us, we are not inclined to treat a judgment in this case as dispositive of claims against the Fund based on post-insolvency services. The receiver's complaint raised only the question of the Fund's liability for certain pre-insolvency services. The record does not give us any clear picture of the circumstances under which the Fund received the product of post-insolvency services. For example, the Fund apparently received numerous reports from Boyd resulting from services said to have been rendered after the determination of Rockland's insolvency. We do not know either how the Fund received those reports or what it knew or reasonably should have known about Boyd's expectations concerning payment. We do not intimate that there is any theory on which post-insolvency creditors may succeed against the Fund. We simply believe that the judgment in this action should not foreclose such a creditor from maintaining a separate action.

3. The procedures to be followed under G. L. c. 175D do not resolve all difficulties. Although the prompt settlement of claims benefits claimants, particularly where those claims are of unquestioned merit, G. L. c. 175D does not deal with claims administration between the time the court appoints a temporary receiver and the time the Fund assumes its statutory duties after the appointment of a permanent receiver. Even after the Fund becomes involved, problems may develop for which G. L. c. 175D

gives no explicit answer. If the receiver does not grant the Fund access to an insolvent insurer's claim files, and if the Fund is not entitled to them as a matter of right (a point we do not decide), the Fund will have to try to duplicate substantial work which has already been completed. If adjusters, appraisers, and attorneys are in the process of investigating and handling various claims under contracts with the insolvent insurer and if the Fund (perhaps even with the receiver's consent) is not entitled to require completion of those contracts, that work will also be wasted. As to future insolvencies, if any of the difficulties and uncertainties in the statutory pattern cannot be worked out by advance agreement between the Commissioner and the Fund, remedial legislation offers a better solution than a series of law suits generated in moments of crisis.

4. Judgment shall be entered declaring that the Fund is not liable to adjusters, appraisers, attorneys, and others who furnished goods or services to Rockland Mutual Insurance Company prior to its insolvency. The judgment shall state that it is not dispositive of any claims against the Fund for services rendered subsequent to Rockland's insolvency or rendered after the appointment, and with the approval, of the temporary receiver.

*So ordered.*