MASSACHUSETTS MOTOR VEHICLE REINSURANCE FACILITY & others[1] *vs.* COMMISSIONER OF INSURANCE & another.[2]

Suffolk.   September 14, 1979. — January 16, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, & LIACOS, JJ.

*Insurance Company*, Insolvency.   *Contract*, Reinsurance agreement.
*Set-Off.   Insurance*, Commissioner of Insurance, Insolvency of insurer,
Reinsurance facility.   *Massachusetts Insurers Insolvency Fund.*

The Massachusetts Insurance Insolvency Fund had a direct right, by vir-
tue of G. L. c. 175D, § 5 (1) (*b*), to proceeds which the Massachusetts
Motor Vehicle Reinsurance Facility owed to an insurer which had
become insolvent.   [532-535]
The Massachusetts Motor Vehicle Reinsurance Facility was not entitled to
set off certain moneys due to it from an insurer under the Facility's
"participating member" account against the moneys owed to the in-
surer under the Facility's "writing member" account in determining
the amount owed to the Massachusetts Insurance Insolvency Fund as a
result of the insurer's insolvency.   [535-540]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on May 21, 1976.

The case was reported by *Kaplan*, J.

*Acheson H. Callaghan, Jr.* (*Scott P. Lewis* with him) for
the plaintiffs.

*Edward T. Dangel, III, & Michael K. Mattchen* for the
receiver.

---

[1] The additional plaintiffs are the Aetna Casualty and Surety Com-
pany, Lumbermens Mutual Casualty Company and Royal Globe Insur-
ance Company, which are members of the Facility and of its Governing
Committee.   The parties have stipulated that these three companies fair-
ly and adequately represent the interests of the Facility and its 216 mem-
bers.

[2] The additional defendant is the Massachusetts Insurers Insolvency
Fund.

*Joseph C. Tanski* for the Massachusetts Insurers Insolvency Fund.

QUIRICO, J. This case requires a determination of the respective rights of a State insurers' insolvency fund and the receiver of an insolvent insurance company to proceeds from a statutory reinsurance plan which are owed to the insolvent insurer by the plaintiff, Massachusetts Motor Vehicle Reinsurance Facility (Facility). The plaintiffs seek a judgment under G. L. c. 231A, declaring whether the proceeds which the Facility would pay to the Rockland Mutual Insurance Company (Rockland) if it were not insolvent should now be paid by the Facility to the Commissioner of Insurance (Receiver) as Receiver of Rockland, or to the Massachusetts Insurers Insolvency Fund (Fund). We must also decide whether the Facility, before paying anyone, is entitled to set off, against the amount it owes, certain moneys due it from Rockland. The parties submitted the case upon a statement of agreed facts. The single justice reserved and reported the case without decision, for determination by the full court upon the pleadings and statement of agreed facts.

We summarize the agreed facts to the extent necessary for an understanding of the issues to be decided.

*The Facility*

The Legislature created the Facility in 1973 by an amendment to G. L. c. 175, § 113H (St. 1973, c. 551, § 5), to provide a State structure for individual insurers to share the burden of providing automobile insurance to high-risk drivers.[3] On November 6, 1973, the Commissioner of Insurance approved a Facility Plan of Operation, pursuant to the statute. The Facility established its accounting and statistical procedures on December 7, 1973.

---

[3] General Laws c. 175, § 113E, provides that insurers must offer policies to all drivers who apply in good faith. The only grounds upon which § 113E allows insurers to reject applicants are failure to pay any insurance premiums in twelve preceding months, or failure to hold a valid driver's license. Thus insurers may not reject an applicant because of a bad driving record.

Under the Facility plan motor vehicle insurers were authorized to "cede" to the Facility their high-risk policies. The Facility maintains two separate accounts for each insurer on a cumulative quarterly basis, a "writing member" account and a "participating member" account. To each writing member account the Facility debits all premiums the insurer receives on those policies it has ceded to the Facility, and credits expenses and losses incurred on those same policies. These included, in the case of Rockland, such items as commission expense allowances, ceding expense allowances, claims expense allowances, and allowances for losses paid. To the insurer's participating member account the Facility debits the insurer's proportionate share of all expenses incurred and losses paid on all policies ceded by all members, determined by its "participation ratio," i.e., its proportionate share of the motor vehicle insurance market, in the Commonwealth for the year. It credits to that account the member's pro rata share of the premiums received on all policies ceded by all members. The Facility then determines periodically a cumulative net balance for each member, by combining the totals of the two accounts. For a given policy year, a company that incurs more losses on ceded policies than would be expected by reason of its participation ratio will have a net balance due to it *from* the Facility. A company with a better than expected record will have a net balance due *to* the Facility for that year. Thus, the basic effect is to shield each participating insurer from disproportionate liability on its high-risk policies. The statute authorizing the Facility makes no provision for insolvency of member insurers, nor does the Facility's Plan of Operation.[4] Rockland is the first member to become insolvent since the creation of the Facility.

---

[4] The Facility's Articles of Organization provided until 1977 that a company whose membership in the Facility terminates shall continue to be bound by the terms of the Articles and the rules of the Facility's Governing Committee. The Articles further provided for apportionment among the remaining members of any balance due to the Facility from an insolvent insurer, but did not provide for payment of a balance due from the

*The Fund*

The Legislature created the Massachusetts Insurers Insolvency Fund in 1970. G. L. c. 175D. (St. 1970, c. 261, § 1). The Commissioner of Insurance, pursuant to § 6 of that chapter, approved a Fund Plan of Operation on August 24, 1972. Membership in the Fund is mandatory for all insurers in the Commonwealth who write certain kinds of policies, including, but not limited to, motor vehicle insurance policies.[5]

The Fund is a "nonprofit unincorporated legal entity" whose function is to pay certain "covered" claims[6] on policies written by an insolvent insurance company. G. L. c. 175D, §§ 3, 5. The Fund periodically assesses member insurers the amounts necessary to pay claims, plus expenses. *Id.* § 5 (1) (c). Payment is determined according to an insurer's over-all share of the insurance market. *Id.* The statute authorizes insurers to include in computing their rates the amounts paid in past years to the Fund. *Id.* § 13. When the Fund utilizes this mechanism, its cost of paying claims against insolvent insurers is thus ultimately passed on to the insurance-buying public. The Fund has paid $1,178,528 in losses arising out of the high-risk policies which Rockland ceded to the Facility, and has incurred certain handling expenses related to those policies.[7]

---

Facility to an insolvent insurer. These provisions were deleted by the 1977 amendment, so that neither payment to nor from the Facility is covered by the present Plan of Operation. This case is governed by the 1974 plan.

[5] The Fund applies to "all kinds of direct insurance, except life, accident and health, workmen's compensation, title, surety, disability, credit, mortgage guaranty and ocean marine insurance." G. L. c. 175D, § 2. See *Commissioner of Ins.* v. *Massachusetts Insurers Insolvency Fund,* 373 Mass. 798 (1977).

[6] A "covered claim" arises out of a policy written by an insurer which becomes insolvent, and either (a) the claimant or insured is a resident of the Commonwealth, or (b) the property from which the claim arises is permanently located in the Commonwealth. G. L. c. 175D, § 1.

[7] The Fund has paid all "covered claims" arising out of Rockland's policies, including the ceded policies. The aggregate amount of claims filed by the Fund in the Rockland receivership proceedings exceeds $7,000,000.

The statute creating the Fund, G. L. c. 175D, predates the Facility statute, and has not been amended to provide for the payment of reinsurance proceeds from the Facility in the event of insolvency of a member insurer.[8]

*Rockland*

Rockland became a member of the Facility upon the latter's inception, as the statute required, and as of January 1, 1974, it ceded to the Facility 11,500 high-risk policies. On July 10, 1974, a single justice of this court adjudged Rockland insolvent pursuant to G. L. c. 175, § 6, and appointed the Commissioner of Insurance permanent receiver. As of that date the Facility computed Rockland's writing member and participating member accounts for the period just before the insolvency decree, and during the post-insolvency period continued to compute Rockland's accounts, with certain adjustments to reflect the transfer of Rockland's policies to other insurers. In September, 1975, the Fund and the Receiver each demanded payment from the Facility of all amounts it owed to Rockland. The Facility made no payments and instead commenced this suit.

Both the Facility and the Fund urge us to hold that the Fund should receive the moneys in question. The Facility, however, maintains that it should have the right first to set off certain moneys owed by Rockland to the Facility in determining the amount due, a point which the Fund disputes. The Receiver argues that we should treat the moneys due to Rockland from the Facility as an asset of Rockland, that the amount should be paid to him and thereupon become available for distribution to all creditors, including the Fund, and that the Facility should not be allowed any set-off.

The Rockland insolvency is governed by G. L. c. 175, § 6, which authorizes the Receiver to "take possession of all the property and effects of the company, to settle its affairs, and to distribute its assets, subject to such rules and orders as the

---

[8] The Fund statute was amended in 1975 in ways not material to this case. St. 1975, c. 341, §§ 1-8.

[Supreme Judicial Court] may prescribe." If, as the Receiver maintains, the Facility proceeds due to Rockland are an asset of the receivership, the Fund would share as a general creditor in the distribution of those proceeds and Rockland's other assets. G. L. c. 175D, § 8 (2). *Commissioner of Ins.* v. *Massachusetts Accident Co.*, 314 Mass. 558, 576-577 (1943).[9]

The Fund and the Facility, in support of their claim that the Fund is directly entitled to the reinsurance proceeds of the Facility, rely on § 5 (1) (*b*) of the Fund statute (G. L. c. 175D). That section provides that "[t]he Fund shall . . . be deemed the insurer to the extent of its obligation on the covered claims and shall have all rights, duties and obligations of the insolvent insurer to such extent." To refute this claim the Receiver points out that c. 175D was modelled upon the National Association of Insurance Commissioners (N.A.I.C.) Post-Assessment Property and Liability Insurance Guaranty Model Act. See 2 Official N.A.I.C. Model Insurance Laws, Regulations and Guidelines §§ 540-1 to 540-11 (1977). This act was also the model for insolvency funds (or "guaranty associations") in many other States. *Id.* at §§ 540-12 to 540-14. See, e.g., Neb. Rev. Stat. §§ 44-

---

[9] We note that this insolvency is not governed by G. L. c. 175, §§ 180A-180L, the Massachusetts version of the Uniform Insurers Liquidation Act, because Rockland wrote policies in the District of Columbia, which is not a "reciprocal state" as defined by § 180A. See *Lewis, Roca, Scoville & Beauchamp* v. *Inland Empire Ins. Co.*, 259 F.2d 318 (10th Cir. 1958); *Ace Grain Co.* v. *Rhode Island Ins. Co.*, 107 F.Supp. 80 (S.D.N.Y.), aff'd 199 F.2d 758 (2d Cir. 1952); *Martin* v. *General Am. Cas. Co.*, 226 La. 481 (1954); Annot., 46 A.L.R.2d 1185 (1956). Section 180F of c. 175 was amended in 1978 to allow the Fund a preferred creditor status in insurer insolvencies. St. 1978, c. 271, § 2. If the Facility proceeds were an asset of Rockland, the 1978 amendment would grant the Fund preferred status against those proceeds and all other assets, in insolvencies governed by the Uniform Act. Because we hold today that the Facility proceeds are not assets of Rockland, however, the applicability of the Uniform Act in future cases will not lead to a different result from that in cases governed by G. L. c. 175, § 6. All proceeds due from the Facility to insolvent insurers, subject to the terms of this opinion, will go directly to the Fund to the extent that the Fund has paid losses on policies ceded to the Facility.

2401 to 44-2418 (1978); N.J. Stat. Ann. §§ 17:30A-1 to 17:30A-19 (Supp. 1979). The N.A.I.C. model act contains neither specific language granting a fund priority creditor status, nor language granting a fund a direct right to reinsurance proceeds. The Receiver maintains that State Legislatures which intend either result have added language to their fund statutes, and have kept their equivalents of § 5 (1) (*b*) as well. He cites as an example California, which has granted its Insurance Guaranty Association a direct right to "the benefit of any amounts recoverable on reinsurance contracts or treaties entered into by the insolvent insurer which cover any of the liabilities incurred by the insolvent insurer [with respect to covered claims actually paid by the Association]." Cal. Ins. Code § 1063.2 (d) (West 1972). (In fact, California does not have a provision equivalent to G. L. c. 175D, § 5 (1) (*b*). See Cal. Ins. Code §§ 1063-1063.13 [West 1972]. Furthermore, California did not follow the N.A.I.C. model act. See 2 Official N.A.I.C. Model Insurance Laws, Regulations and Guidelines, § 540-12 [1977]). In addition, he cites cases which interpret other States' provisions analogous to G. L. c. 175D, § 5 (1) (*b*), as not granting a direct right of access to reinsurance proceeds. *Skandia America Reinsurance Corp.* v. *Barnes*, 458 F. Supp. 13 (D. Colo. 1978). *Skandia America Reinsurance Corp.* v. *Schenck*, 441 F. Supp. 715 (S.D.N.Y. 1977). *General Reinsurance Corp.* v. *Missouri Gen. Ins. Co.*, 458 F. Supp. 1 (W.D. Mo. 1977), aff'd, 596 F.2d 330 (8th Cir. 1979).

We find the argument of the Receiver unpersuasive because the statutes and cases cited in its support deal with rights of access to the proceeds of *private* reinsurance contracts (or "treaties") entered into by insurers either before or after insolvency. The question in all three cases cited above was whether an organization similar to the Massachusetts Fund, rather than the receiver of an insolvent insurer, should receive the proceeds of a private reinsurance treaty with an "insolvency clause." Such a clause makes reinsurance proceeds payable upon insolvency to the "receiver, liq-

uidator or statutory successor" of the insolvent insurer without regard to whether the receiver has paid any covered losses.[10] See generally Olson, Reinsurers' Liability to the Insolvent Reinsured, 41 Notre Dame Law. 13 (1965). The Receiver has cited no case, and we have found none, dealing with the right of access of a State insolvency fund to the proceeds of a State-created reinsurance facility.[11] The Massachusetts scheme, whereby insurers cede high-risk policies to the Facility, and, upon insolvency of the insurers, the Fund pays losses on those (and other) policies, was intended to benefit the public in two ways. First, the existence of the Facility attracts insurers into the high-risk market. Second, the existence of the Fund ensures that all drivers with "covered" policies will be paid for losses incurred. Before the creation of the Facility, the reinsurance proceeds which it now generates would not have been available to Rockland. If the Facility proceeds were to be paid to the Receiver, this in effect would create a windfall for the receivership and its preferred creditors, and the Fund (and other general creditors of Rockland) would recover little or nothing. We do not think that the Legislature intended such a result when it created the Facility. The Legislature has required that all insurers who write certain policies be members of both the Fund, G. L. c. 175D, § 3, and the Facility, G. L. c. 175, § 113H, and it has required that insurers provide coverage for high-risk drivers. The Fund has

---

[10] The reason for including an "insolvency clause" in a private reinsurance treaty is to overcome the holding of *Fidelity & Deposit Co.* v. *Pink,* 302 U.S. 224, 227-229 (1937), that a standard reinsurance treaty "against loss" renders the reinsurer liable only upon proof of payment of losses by the insurer. Similarly, G. L. c. 175, § 20 ("Reinsurance"), is not applicable to this case because it deals with private reinsurance treaties. Section 20 provides language which must be included in a reinsurance treaty if the reinsurer is to be liable at all after insolvency. The Facility concedes its liability and asks only that we determine to whom and in what amount it is liable.

[11] The concept of a legislatively created reinsurance facility to help solve the problem of mandatory insurance for the high-risk driver is a relatively new one, and Massachusetts is one of the first states to adopt it.

paid the claims of these drivers. When the over-all statutory insurance scheme is considered, it appears that the Legislature must have intended that the Fund have a direct right to Facility proceeds by virtue of G. L. c. 175D, § 5 (1) (*b*), and we so hold.[12]

The second question for our consideration is whether the Facility is entitled to set off certain moneys due to it from Rockland in determining the amount it must pay to the Fund. We begin our analysis of this question with a description of the Facility accounting procedures.

As described above, the Facility maintains two accounts for each member insurer. It computes the two accounts on a cumulative, quarterly basis, and keeps the accounts separate. On July 10, 1974, the Facility computed Rockland's cumulative accounts for the quarter immediately preceding insolvency. The result was a net amount due to the Facility from Rockland on the writing member account of $1,523,505, and an amount of $131,249 due from the Facility to Rockland on the participating member account.

The Facility has continued to compute Rockland's accounts on a quarterly, cumulative basis since insolvency. The parties have agreed that we should decide this case on figures up to December 31, 1977, and they will apply the principles enunciated herein to the accounts as updated to the date of this decision. We accept this arrangement.[13] On

---

[12] The Fund statute provides that any person recovering from the Fund "shall be deemed to have assigned his rights under the policy to the Fund to the extent of his recovery from the Fund," and further provides that the "receiver, liquidator or statutory successor of an insolvent insurer . . . shall grant, against the assets of the insolvent insurer, priority equal to that to which the claimant would have been entitled in the absence of this chapter." G. L. c. 175D, § 8 (1)-(2). The Receiver maintains that these clauses effectively subrogate the Fund to the rights of policyholders as general creditors. While this may be true as to non-high-risk drivers, this scheme did not contemplate the creation of the Facility and does not affect the allocation of Facility proceeds as determined in this opinion.

[13] All losses which Rockland is obligated to pay (and therefore the Fund to assume) arose either before insolvency or within the statutory thirty-day period during which Rockland's policies were transferred to other in-

December 31, 1977, the procedure described above (with certain adjustments to reflect Rockland's insolvency and the transfer of its policies to other insurers) produced a writing member account with a net balance due to Rockland from the Facility of $490,670. The participating member account showed Rockland owing the Facility $195,673.

The Facility urges us to allow it to set off amounts due to it from one account against amounts it owes Rockland from the other.[14] It argues that the accounts are actually one "open," running account between each member and the Facility. Alternatively, if we find that there are two accounts it asks us to declare an equitable right of set-off of mutual debts.

We believe that the writing member and the participating member accounts are two separate accounts, and the Facility should not be allowed to set off one against the other in determining the amount due. We find nothing in the Facility Plan of Operation which provides that the two accounts shall be "netted out" in computing balances due to or from the Facility. Article VIII of the Plan,[15] which establishes the procedure for writing member accounts, provides in § (5) that "[t]he Facility shall, quarterly or less frequently as determined by the [Governing] Committee, issue summaries to all members reflecting each Member's cumulative balances on business it ceded to the Facility, providing reimbursement for those Members with allowable credits in excess of written premiums, and shall submit a

surers. G. L. c. 175, § 6. These claims often require time to be settled. Therefore we reject the argument of the Receiver that the continued computation of Rockland's accounts after insolvency is an attempt to impose an obligation on Rockland for postinsolvency losses.

[14] If the July 10, 1974, accounts described in the text above were combined, the result would be a balance of $1,392,256 owed by Rockland to the Facility. If the December 31, 1977, accounts described above were combined in this manner, it would result in a net debt by the Facility to Rockland of $294,997.

[15] We refer here to the 1974 Plan, which was in effect during the events in question here. The 1977 Plan maintains essentially the same accounting procedures.

statement to those Members with premiums which are in excess of allowable credits. A Member so billed for premiums written shall remit such excess within fifteen working days . . . ." Article IX of the Plan provides for participating member accounts, or the allocation of "Facility expenses and the profits or losses from eligible risks ceded to the Facility . . . ." Article IX(2) provides that "[a]ssessments to pay for Facility losses and expenses shall be levied as frequently as the Governing Committee deems necessary." The Facility relies on its "Accounting and Statistical Procedures" of 1973. This document states: "To reduce unnecessary cash flow of funds for each member company, the Facility will accumulate the amount of net balance due as a writing company . . . and will calculate the balance due by a participating member company . . . . This method of continual netting of inception to date participation provides for the truing up of policy year data on a quarterly basis. Thus, only the net settlement amount is due either the member company or the Facility." This "continual netting" method is apparently one adopted for efficiency, and does not affect the language of the Plan of Operation that the two accounts are to be treated separately.

Our view that the two accounts are separate is reinforced by two other items in the record. Article III (3) of the 1974 Facility Plan of Operation provided that "[a]ny unsatisfied net liability to the Facility of any insolvent Member shall be assumed by and apportioned among the remaining Members in the Facility in the same manner in which assessments or gains are apportioned by the Facility. The Facility shall have all rights allowed by law on behalf of the remaining Members against the estate or funds of such insolvent Member for sums due the Facility." The Receiver urges us to interpret the phrase "net liability" to refer only to liability as a participating member, which we believe is the correct interpretation. The phrase "in the same manner in which assessments or gains are apportioned" appears to refer to Article IX of the Plan, the procedure for participating member accounts.

The second item in the record which supports the separate accounts interpretation is the series of cumulative account quarterly reports, which show that the "losses paid credit" pursuant to Article VIII (3) of the Facility Plan included a credit for the $1,178,528 paid by the Fund of losses arising out of the ceded policies. The figures indicate that no balance would be due to Rockland as a writing member but for this credit, which resulted from payment of losses by the Fund.

The Facility must collect any amount due to it on Rockland's participating member account by filing a claim in the insolvency proceedings and, to the extent that the claim is not entirely satisfied, may assess its remaining members pursuant to Article III (3) as quoted above. Any amount due to Rockland as a writing member should be paid to the Fund.

The amount due on each account depends on whether there is a right of set-off within either the writing member or the participating member account.

There is no provision of the General Laws governing this case which allows a right of set-off. Chapter 232, "Set Off and Tender," was repealed in 1975. St. 1975, c. 377, § 111. Chapter 216, § 34, which allowed set-off of mutual debts in the general scheme of insolvency, was repealed in 1978. St. 1978, c. 478, § 137. Chapter 175, § 6, contains no set-off provision. In the absence of a statute, there is power in equity to "compel a set-off of cross demands or of judgments . . . whenever necessary for the proper administration of justice." *Perry* v. *Pye,* 215 Mass. 403, 413 (1913). *Haverhill Manor, Inc.* v. *Commissioner of Pub. Welfare,* 368 Mass. 15, cert. denied, 423 U.S. 929 (1975). *Cromwell* v. *Parsons,* 219 Mass. 299 (1914). The right has been allowed against insolvent insurers in the absence of a statute. *Commonwealth* v. *Shoe & Leather Dealers' Fire & Marine Ins. Co.,* 112 Mass. 131, 135 (1873). See also *Carr* v. *Hamilton,* 129 U.S. 252, 255-256 (1889). The right does not necessarily depend on whether there is a mutual "open" account. See

*Jefferson Union Co.* v. *American Radiator & Standard Sanitary Corp.*, 329 Mass. 692 (1953); *Perry, supra.*

There is some authority in the Commonwealth that an equitable set-off against the assets of an insolvent company would give the claimant priority over other creditors of the same class and therefore should be disallowed. *Cosmopolitan Trust Co.* v. *Wasserman,* 251 Mass. 514, 517 (1925). *Commonwealth* v. *Shoe & Leather Dealers' Fire & Marine Ins. Co., supra* at 135 (right allowed only when no interested creditors or debtors on either side). The contrary view is expressed in an early case, which viewed it as "exceedingly unjust to compel Hatch to pay the whole sum [he owed to insolvent Greene], and then receive a small dividend on the very money he had paid, perhaps the only money to be divided." *Greene* v. *Hatch,* 12 Mass. 195, 198 (1815). Accord, *Scott* v. *Armstrong,* 146 U.S. 499, 510 (1892).

If the issue in this case were whether the Facility could set off against Rockland what was owed to it by Rockland as a writing member as of the date of insolvency against what it owed to Rockland on the same date, there might be a good argument for applying the rule of *Greene* v. *Hatch, supra.* However, here the Facility is attempting to set off against the Fund what Rockland owed it upon insolvency (consisting primarily of premiums on the ceded policies) against what it presently owes the Fund. That anything is presently owing by the Facility to Rockland's account is due solely to the Facility's accounting procedure of crediting the "losses paid" by the Fund. There is no mutual obligation between the Facility and the Fund; that is, the Fund has no duty to pay premiums which the Facility could have collected from Rockland before it became insolvent. In *Commissioner of Ins.* v. *Massachusetts Insurers Insolvency Fund,* 373 Mass. 798 (1977), we held that the Fund is not liable for claims of general business creditors of Rockland incurred before insolvency. We think the same principles apply to the Facility's claim for premiums against Rockland. There is no provision in the Fund statute for pre-

mium payment. Rockland owed the premiums before in-
solvency. Therefore, there is no debt owing from the Fund
to the Facility, and there can be no set-off.[16]

We recognize that there is an alternative solution. If the
set-off were allowed, the Fund could claim the unreim-
bursed amount in the Rockland receivership, and Rock-
land's other creditors would be no better off than if the
same amount were claimed by the Facility. The deficiency
resulting from the insufficiency of Rockland's assets, like the
deficiency under policies not ceded to the Facility, would be
borne by the insurer members of the Fund, who include fire
and other insurers as well as motor vehicle insurers. Ulti-
mately, of course, the loss would be reflected in increased
insurance rates, and would be borne by the insurance-
buying public. Under our decision, the loss falls instead on
the insurer members of the Facility, who are all motor vehi-
cle insurers, and ultimately on their insureds. We see no
basis for choosing between the two solutions on a ground of
fundamental fairness.

Within the participating member account, the issue of
set-off is between the Facility and the Receiver. Because
there is a balance due from Rockland on this account, the
set-off issue would be whether the Receiver may exercise
set-off in a suit by the Facility. The principles governing
the relationship between these parties differ, and the cases
holding that mutual debts may be set off apply.

To summarize, the Facility should pay to the Fund the
amount due on Rockland's writing member account,
without set-off for amounts owed by Rockland. The Facil-
ity may then file a claim in the Rockland receivership pro-
ceedings for these amounts, and amounts due on the par-
ticipating member account after any set-off by the Receiver.

---

[16] The case cited by the Receiver in support of its opposition to set-off
within the writing member account, *Melco Sys.* v. *Receivers of Trans-
America Ins. Co.*, 268 Ala. 152 (1958), is inapposite to this case, because
it turned on contractual provisions of a reinsurance treaty and because
it dealt with respective rights of a receiver and a reinsurer.

This action is remanded to the Supreme Judicial Court for the county of Suffolk for the entry of a judgment in accordance with this opinion.

· *So ordered.*