Troy, Paul E., J.
The plaintiff, Massachusetts Care Self-Insurance Group, Inc. (“MCSIG”), sought payment from the defendant, Massachusetts Insurers Insolvency Fund (“Fund”), on insurance policies its insolvent insurer had issued. After the Fund denied MCSIG’s requests, MCSIG commenced this action pursuant to G.L.c. 231A, essentially seeking a declaration that MCSIG is not excluded from the Fund’s obligation under G.L.c. 175D to pay the claims of insolvent insurers. The case is before this court on MCSIG’s motion for partial summary judgment and on the Fund’s cross motion for summary judgment. For the following reasons, the Fund’s motion is ALLOWED and MCSIG’s motion is DENIED.
BACKGROUND
The following facts are viewed in the light most favorable to MCSIG as the non-moving parties. Humphrey v. Byron, 447 Mass. 322, 325 (2006).
I. MCSIG
MCSIG filed its Articles of Organization under G.L.c. 180 in September 1990, establishing itself as a non-profit workers’ compensation self-insurance group pursuant to G.L.c. 152, §§25E-25U, for the purpose of “support[ing] the interests of organizations engaged in the nursing home, long-term care and assisted residential living industry in Massachusetts . . .” MCSIG Articles of Organization, Article II. Members of MCSIG (“member employers”) are required to make payments to MCSIG “consist[ing] in part of required premium payments and other payments . . . to cover the costs of purchasing excess insurance, establishing and maintaining a claims fund account, and establishing and maintaining an administrative fund account.” MCSIG Bylaws, §1.3; see G.L.c. 152, §250. MCSIG is currently made up of thirty-nine member employers.[1]
MCSIG has a Massachusetts Workers’ Compensation and Employers’ Liability Coverage Certificate (“Certificate”) with each of its member employers.[2] The Certificate describes the arrangement between MCSIG and its member employers as “a contract of liability coverage” under which MCSIG agrees to “pay promptly when due the benefits required of [the member employer] by the worker’s compensation law.” Certificate, at 6, 7, and Endorsement. Additionally, MCSIG reserves the right “to inspect [the member employers’] workplaces at any time.” Certificate, at 15. These inspections “relate only to the insurability of the workplaces and the premiums to be charged . . . [MCSIG] may .. . recommend changes” to the member employers based on these inspections. Id. MCSIG acknowledges that this provision is “the same” as the rights “[ijnsurance rate service organizations have . . .” Id.
MCSIG and its member employers also enter into an Application and Indemnity Agreement (“Indemnity Agreement”), pursuant to which MCSIG “agrees to provide the [m]ember [employer] with the customary risk management services and workers’ compensation and employers’ liability coverage as and to the extent described in [MCSIG’s] [C]ertificate[,]” and pursuant to which the member employer “agrees to pay the premiums, assessments, and entry fee, if any, as provided herein, for such services and coverage, any late fees, interest or liquidated damages as provided in the By-Laws . . . and all costs of collection thereof, including attorneys fees.” Indemnity Agreement, §6.[3] MCSIG further agrees “[t]o administer, investigate, settle, and pay all of the workers’ compensation claims and such other liabilities as are defined in the [Certificate to prepare all required forms; .. . to provide a defense if required!;] . . . [to] negotiate settlements!;] . . . [and to] retain and supervise legal counsel necessary for the prosecution or defense of any litigation on behalf of and at the expense of [MCSIG].” Indemnity Agreement, §12; see Certificate, at 7. Finally, MCSIG and its member employers agree
*131 to defend, indemnify and hold harmless each other and every other member [employer] of [MCSIG] . . . from and against any claim or damage arising from the non-compliance by the indemnitor with a provision of . . . [G.L.c. ] 152 . . . [and] [although recourse for any and all payments of workers’ compensation and employers’ liability benefits covered by [MCSIG’s] [C]ertificate . . . shall first be made to [MCSIG’s] assets (but not the individual assets of any member of [MCSIG]), [each] [m]ember [employer] understands, acknowledges, and agrees that, under said Chapter 152, the [m]ember [employer] is and shall be jointly and severally liable for the workers’ compensation and employers’ liability obligations of [MCSIG] and its member[] [employers] which were incurred during the [mjember [employer’s] period of membership in [MCSIG] . . .
Indemnity Agreement, §15(a), (b); see G.L.c. 152, §25G(l)(i) (requiring workers’ compensation self-insurance groups to enter into “indemnity agreement jointly and severally binding the group and each member thereof’).[4]
A board of trustees made up of representatives of the member employers manages MCSIG. MCSIG Bylaws, §4.1; see G.L.c. 152, §25J. Among the board’s powers is the authority to “[p]urchase . . . insurance or reinsurance and surety bonds[,]” MCSIG Bylaws, §4.3.1(f), to adopt rules concerning the “[p]ayment of workers’ compensation claims and losses incurred by” member employers, MCSIG Bylaws, §4.3.1(e), and to “appoint an Administrator . . .” MCSIG Bylaws, §4.5. The Administrator is “an individual, partnership, corporation or unincorporated association engaged ... to carry out the policies established by the board of trustees and to provide daily management of the [MCSIG].” MCSIG Bylaws, §1.1.[5]
Reliance National Indemnity Company (“Reliance”) issued two insurance policies to MCSIG for the time period of January 1, 1995, through January 1, 1996: (1) “Specific Excess Workers’ Compensation and Employers’ Liability Policy” (“Specific Policy”) and (2) “Reinsurance effected by Holbom Corporation (“Holb-ornPolicy”) (collectively, “Reliance Policies”).[6] Reliance was adjudicated insolvent in October 2001, and the Fund took over the administration of Reliance’s claims pursuant to G.L.c. 175D.[7]
II. Specific Policy
The Specific Policy named MCSIG as the insured. MCSIG agreed to certain retentions:
a. Retention each loss: $250,000 per accident and per employee as respects occupational disease.
b. Aggregate Retention: Subject to audit at the end of the Policy Period, the Insured’s Aggregate Retention . . . shall be the greater of either
(1) 105% of the Manual Premium
or
(2) Minimum Loss Fund amount of $9.492,000.
In determining whether the Insured’s Aggregate Retention has been exhausted, the following Loss Limitations shall be applied:
(1) Each accident: $250.000: and
(2) Each employee for disease: $250.000.
Specific Policy, Endorsement #2, §1 (bold and underlining in original).[8] “Once [MCSIG’S] Aggregate Retention has been exhausted by payment of losses, [Reliance] agrees to indemnify [MCSIG] for claims expenses but only until [Reliance’s] Limit of Indemnify is exhausted by the payment of losses.” Specific Policy, Endorsement #2, §3 (bold in original). Reliance’s “Limits of Indemnity” were as follows: $19,750,000 for workers’ compensation; $1,000,000 for employers’ liability; and $2,500,00 for the annual aggregate.[9]
The Specific Policy expressly applied to loss MCSIG sustained as a result of
(A) compensation and other benefits required of [MCSIG] by the workers’ compensation law; and
(B) sums which [MCSIG] shall become legally obligated to pay as damages because of bodily injury by accident or disease ... by any employee of [MCSIG] arising out of in the course of his employment by [MCSIG] . . .
Specific Policy, Insuring Agreements, §I(A), (B).[10] The Specific Policy defined “loss” as “only such amounts as are actually paid in cash by [MCSIG] in payment of benefits under the workers’ compensation law, in settlement of claims or in satisfaction of awards of judgments.” Specific Policy, Insuring Agreements, §IV(G).
III. Holbom Policy
The Holborn Policy consists of a “Cover Note” and a Workers’ Compensation and Employers' Liability Excess of Loss Reinsurance Agreement (“Holbom Agreement”). The former identified MCSIG as the re-insured company and Reliance as the reinsurer, and provided that it covered “Workers Compensation & Employers Liability Excess of Loss” with a “Limit and Retention” as follows:
Section 1) Specific Coverage of $19,750,000 each and every accident each and every loss excess of $250,000 each and every accident each and every loss.
Section 2) Aggregate coverage of $2,500,000 excess 105% of modified premium or $8,543,000, whichever the greater.
Holbom Policy, Cover Note.
The Holbom Agreement portion of the Holbom Policy named MCSIG as the “reassured” and Reliance as the reinsurer, and provided a similar explanation of Reliance’s “Limit and Retention” as follows:
*132 [Reliance] shall be liable hereunder for any amount not exceeding $19,750,000 ultimate net loss in any one accident or occurrence in excess of $250,000 ultimate net loss in any one accident or occurrence.
In addition . . ., [Reliance] shall be liable for the amount not exceeding $2,500,000 in the aggregate in excess of the greater of 105% of modified premium or $8,543,000.
Holborn Agreement, Article 5. The Agreement defined “ultimate net loss” as
the amount actually paid by [MCSIG] in settlement of losses for which it is liable ... in the investigation, appraisal, adjustment, settlement, litigation, defense or appeal, or payment of claims or judgments arising from each and every loss for which [MCSIG] is or may be found liable under its contracts of insurance or reinsurance, less . . . amounts recovered or recoverable under pooling agreements or other reinsurances, whether collectible or not. . .
Holborn Agreement, Article 6.[11]
Reliance agreed “to indemnify [MCSIG] in respect of the net excess liability . . . which may accrue to [MCSIG] during the term of this Agreement under all policies, binders, or certificates of insurance or rein-sures . . . issued or entered into by or on behalf of [MCSIG] . . . and classified by [MCSIG] as Workers’ Compensation and Employers’ Liability business.” Holborn Agreement, Article 2. Reliance’s obligation did not extend to
[a]ny loss or liability accruing to [MCSIG][12] directly or indirectly from any insurance written by or through any pool of [sic] association including pools or associations in which membership by [MCSIG] is required under any statutes or regulations; . . . [b]usiness written to apply in excess of a self-insured amount of more than $2,500 or business written to apply specifically in excess over underlying insurance!,]
Holborn Agreement, Article 3(B), (D) (footnote added); or to insurance with “a manual premium, as defined under the rating plan of [MCSIG] of Two Hundred-Fifty Thousand Dollars ($250,000) or greater”;[13] or with “an incurred loss of more than 50% of [MCSIG’s] retention hereunder.” Holborn Agreement, Article 3(E)(gg), (E)(hh).
IV. Gorski Claim
At all times relevant to this action, East Longmeadow Nursing Home (“Longmeadow”) was one of MCSIG’s member employers. On December 14, 1995, Longmeadow employee Susan Gorski injured her back in the course of her employment (“Gorski claim”). Thereafter, Longmeadow sought workers’ compensation coverage for the Gorski claim from MCSIG.
Between January 1996 and December 2005, MCSIG paid $273,087.07 on the Gorski claim, thus exceeding MCSIG’s self-insured retention. On December 16, 2005, MCSIG submitted its reimbursement request to the Fund. In a May 17, 2006, letter, the Fund denied MCSIG’s claim on the grounds that the Reliance Policies did not constitute “direct insurance” thus the Gorski claim, arising under the Reliance Policies, was not a “covered claim,” and that MCSIG was a “reinsurer, insurer, insurance pool or underwriting association” excluded from coverage from the Fund. MCSIG disputed the two reasons for the Fund’s denial in a letter dated September 28, 2006, and the Fund responded in a letter dated November 13, 2006, again refusing to make payment.
DISCUSSION
“The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law.” Humphrey, 447 Mass. at 325, quoting Anderson St. Assocs. v. Boston, 442 Mass. 812, 816 (2004); see Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy its burden either by submitting affirmative evidence negating an essential element of the opposing parly’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. LaLonde v. Eissner, 405 Mass. 207, 209 (1989); see Polaroid Corp. v. Rollins Envtl. Servs., Inc., 416 Mass. 684, 696 (1993) ("[BJare assertions and conclusions . . . are not enough to withstand a well-pleaded motion for summary judgment”).
The Fund is “a nonprofit unincorporated legal entity . . . consisting of all insurers.” G.L.c. 175D, §3. “Chapter 175D prescribes a procedure for the formation and maintenance of the Fund in order that it will be available to settle certain unpaid claims which arise out of and are within the coverage of an insurance policy issued by an insolvent insurer.” Commissioner of Ins. v. Massachusetts Insurers Insolvency Fund, 373 Mass. 798, 799 (1977). When an insurer is adjudicated insolvent, the Fund becomes responsible for those claims against that insolvent insurer up to $300,000. G.L.c. 175D, §5(l)(a) (obligating Fund “to the extent of the covered claims against the insolvent insurer existing prior to the declaration of insolvency”); see G.L.c. 175D, §1(4) (defining “insolvent insurer” as “insurer *133 authorized to transact insurance in this Commonwealth . . . determined to be insolvent by a court of competent jurisdiction”). As a result of taking on this obligation, the Fund is “deemed the insurer to the extent of its obligation on the covered claims and shall have all rights, duties and obligations of the insolvent insurer to such extent. . .” G.L.c. 175D, §5(l)(b). The Fund’s obligation is limited, however, and it is on the extent of these limitations that the parties’ dispute rests.
There are no material facts in dispute. First, the parties do not dispute that MCSIG is a workers’ compensation self-insurance group properly organized under G.L.c. 152, §§25E-25U, and approved by the Commissioner of Insurance. Second, the parties do not dispute that Reliance provided coverage to MCSIG under the Specific Policy and the Holborn Policy for the time period during which the Gorski claim arose. Third, the parties do not dispute that MCSIG has exceeded its self-insured retention, thereby triggering the Reliance Policies. Finally, the parties do not dispute that, as a result of Reliance’s insolvency, the Fund is responsible for those obligations of Reliance that constitute “covered claims” under G.L.c. 175D. The dispute between the parties, instead, results from conflicting characterizations of MCSIG and the Reliance Policies.
With respect to the dispute regarding MCSIG’s status, the Fund’s obligation extends only to “covered claims against the insolvent insurer .. .” G.L.c. 175D, §5(1)(a). “All other claims not provided for in G.L.c. 175D must be denied." Pilon’s Case, 69 Mass.App.Ct. 167, 172 (2007), citing G.L.c. 175D, §5(l)(d). A “covered claim” is “an unpaid claim . . . which arises out of and is within the coverage of an insurance policy to which [G.L.c. 175D] applies issued by an insurer, if such insurer becomes an insolvent insurer . . .” Id. A “covered claim” does not include “any amount due a reinsurer, insurer, insurance pool or underwriting association . . .” G.L.c. 175D, § 1 (2)(2). The Fund argues that MCSIG is an insurer, and thus the Gorski claim is not a covered claim. MCSIG disputes that a workers’ compensation self-insurance group is an insurer for purposes of G.L.c. 175D.
With respect to the dispute concerning the Reliance Policies, the Fund only applies to “direct insurance!,]” G.L.c. 175D, §2, a term that the statute does not define.[14] The Fund argues that the Reliance Policies are not direct insurance but excess insurance and reinsurance policies and thus outside the scope of the Fund’s obligation. MCSIG, conversely, argues that while the Reliance Policies are excess insurance policies, excess insurance is direct insurance.
Resolution of these arguments requires the court to consider the interaction between G.L.c. 152 and G.L.c. 175D. Although Massachusetts appellate courts have previously dealt with overlap between these two statutes, the cases have not involved workers’ compensation self-insurance groups. This matter is therefore one of first impression.
I. Insurer
A. G.L.c. 152
With G.L.c. 152, the Workers’ Compensation Act (“Act”), the Legislature requires “every employer” in Massachusetts to “provide for the payment to his employees of’ workers’ compensation either by “a license as a self-insurer[,]” G.L.c. 152, §25A(2), or “(b]y insurance with an insurer or by membership in a workers’ compensation self-insurance group, established pursuant to the provisions of sections twenty-five E to twenty-five U” of the Act. G.L.c. 152, §25A(1). The member employers in this case opted to join MCSIG, a workers’ compensation self-insurance group. As a workers’ compensation self-insurance group, MCSIG is
a corporation formed under the provisions of chapter one hundred and eighty consisting of five or more employers who are engaged in the same or similar type of business, who are members of the same bona fide industry, trade or professional association which has been in existence for not less than two years or who are parties to the same or related collective bargaining agreements, and who enter into agreements to pool their liabilities for workers’ compensation benefits and employer’s liability in this state.
G.L.c. 152, §25E; 211 Code Mass. Regs. §67.02 (setting forth identical definition of workers’ compensation self-insurance group); see G.L.c. 152, §25E (defining “ ‘[workers’ compensation’, when used as a modifier of benefits, liabilities or obligations, . . . [as] both workers’ compensation and employer’s liability”); 211 Code Mass. Regs. §67.02 (same).
Workers’ compensation self-insurance groups are subject to the provisions of G.L.c. 152 and its regulations “governing the conduct of insurers with respect to the payment of workers’ compensation benefits, and [are] subject to all fees, fines, penalties and assessments levied upon insurers for failure to comply with the claim procedures” of the Act. G.L.c. 152, §25E; 211 Code Mass. Regs. §67.03(2). This sentence in §25E provides, then, that for purposes of workers’ compensation and insofar as the Act applies, MCSIG is an insurer. In that same section, however, the statute limits the characterization of such groups as insurers, stating that they “shall not be deemed to be insurers or insurance companies and shall not be subject to the provisions of the insurance laws and regulations of the commonwealth except as otherwise provided” in the Act. G.L.c. 152, §25E (emphasis added). MCSIG and the Fund disagree as to whether the “and” joining the two clauses limits the statement in the first clause “to the provisions of the insurance laws and regulations ...” Id.
*134 The Act’s own definition section suggests that the first clause is so limited: “[t]he term ‘insurer’ as used in [G.L.c. 152], except where used to refer to the regulations of insurance companies by the division of insurance . . . , shall include where applicable a workers’ compensation self-insurance group established pursuant to the provisions of sections twenty-five E to twenty-five U, inclusive.” G.L.c. 152, §1(7) (emphasis added).[15] This definition further provides that an "insurer” is any entity “which has contracted with an employer to pay the compensation provided for by” the Act. Id. Moreover, the stated definitions for “words used in” G.L.c. 152 apply “unless a different meaning is plainly required by the context or specifically prescribed . . .” G.L.c. 152, §1.
The regulations governing workers’ compensation self-insurance groups that the Commissioner of Insurance has promulgated provide further insight into the two .clauses of this sentence in §25E. The stated purpose of section 67.00 of title 211 of the Code of Massachusetts Regulations “is to implement the provisions of M.G.L.C. 152, §§25E through 25U, . . . governing the formation, operation and oversight of workers’ compensation self-insurance groups in the Commonwealth.” 211 Code Mass. Regs. §67.01; see Black’s Law Dictionary 1289 (7th ed. 1999) (defining “regulation” as “rule or order, having legal force, issued by an administrative agency” that “explain[s] and interprets the” controlling statute). Section 67.03 states that “[a] workers’ compensation self-insurance group shall not be considered to be an insurance company and shall not be subject to the provisions of M.G.L.C. 175 or any regulations thereunder except as otherwise provided in G.L.c. 152 or 211 CMR 67.00.” 211 Code Mass. Regs. §67.03(1).
This provision therefore interprets the two clauses in G.L.c. 152, §25E, as imposing on the first clause the limitations contained within the second clause. That is, “[a] workers’ compensation self-insurance group . . . shall not be deemed to be insurers or insurance companies” only with respect “to the provisions of the insurance laws and regulations of the commonwealth . . .” G.L.c. 152, §25E; 211 Code Mass. Regs. §67.03(1).[16] Thus, taken together, these sections provide that an insurer is an entity that contracts with an employer to pay that employer’s workers’ compensation benefits; when the entity is a workers’ compensation self-insurance group, the group is an insurer, but it is not subject to G.L.c. 175 or the regulations promulgated thereunder. See G.L.c. 152, §§1(7), 25E; 211 Code Mass. Regs. §67.03(1).
Even though workers’ compensation self-insurance groups are not subject to the provisions of G.L.c. 175 and its regulations, G.L.c. 152 subjects these groups to requirements similar to those that G.L.c. 175 imposes. For example, the Commissioner of Insurance is authorized to “grant[ ] licenses or certificates of authority to a company to issue policies of insurance!,]” G.L.c. 175, §4, and requires “an annual report to be filed by each insurer writing workers’ compensation insurance in the Commonwealth.” G.L.c. 175, §25A. MCSIG is not licensed to transact insurance business in Massachusetts; indeed, it cannot be so licensed as it is not subject to the provisions of the insurance laws and regulations. G.L.c. 152, §25E. The Commissioner of Insurance has, however, issued MCSIG a certificate of approval based on MCSIG’s application, G.L.c. 152, §§25F, 25G, and MCSIG must “be audited at least annually by an auditor approved by the commissioner of insurance to verify proper classifications [for calculation of member employers’ premiums], experience rating, payroll and rates.” G.L.c. 152, §250(4); see 211 Code Mass. Regs. §67.06 (setting forth application process for certificate of approval); 211 Code Mass. Regs. §67.09(5) (concerning annual audit requirement).
The insurance law also permits entities to “be incorporated under and subject to the provisions of [G.L.c. 175]” in order “to insure the payment of workers’ compensation benefits under chapter one hundred and fifty-two.” G.L.c. 175, §47, sixth (a). A workers’ compensation self-insurance group cannot incorporate itself under this provision. G.L.c. 152, §25E. Instead, a workers’ compensation self-insurance group may be either “a not-for-profit unincorporated association or a corporation formed under the provisions of chapter one hundred and eighty!,]” and MCSIG chose the latter option. Id.; 211 Code Mass. Regs. §67.02 (defining “Workers’ Compensation Self-Insurance Group” similarly); see G.L.c. 180, §4(n) (providing that one purpose of G.L.c. 180 is to “establish! ] a not-for-profit association of employers as authorized by section twenty-five E of chapter one hundred and fifty-two, including such not-for-profit associations of employers organized as nonprofit corporations”). Additionally, “an individual, partnership, corporation or unincorporated association” may serve as the administrator that the group’s board of trustees has engaged “to carry out the policies established by the group’s board of trustees and to provide daily management of the group.” G.L.c. 152, §25E; 211 Code Mass. Regs. §67.02 (defining “Administrator” similarly). Provisions specific to the creation and function of workers’ compensation self-insurance groups in G.L.c. 152 parallel those in G.L.c. 175, thus the exclusion from G.L.c. 175 of workers’ compensation self-insurance groups is insufficient to conclude that MCSIG is not an insurer for purposes of G.L.c. 175D.
The way in which MCSIG itself functions supports this conclusion as well. With G.L.c. 152, the Legislature requires “every employer” in Massachusetts to “provide for the payment to [its] employees” of workers’ compensation benefits. G.L.c. 152, §25A. The employer then has the option of providing this coverage itself, “as a self-insurer[,]” G.L.c. 152, §25A(2); or “[b]y insurance with an insurer or by membership in a workers’ compensation self-insurance group . . .” *135 G.L.c. 152, §25A(1). The Legislature offers the latter option to the employer as an alternative to purchasing insurance on its own directly from an insurer. See id. The role that MCSIG takes on for the member employers, then, is that of workers’ compensation insurer, and the documents it enters into with its member employers reflects this role.
The Certificate describes MCSIG’s arrangement with the member employers as a “contract of liability coverage” and MCSIG agrees to pay the workers’ compensation benefits required of the member employers. Additionally, MCSIG retains its right in the Certificate to inspect the workplaces of its member employers and acknowledges that these inspections are relevant “only to the insurability of the workplaces and the premiums” MCSIG charges the member employers. (Emphasis added.) In retaining this right, MCSIG equates itself with “(¡Insurance rate service organizations . . .” In the Indemnity Agreement, MCSIG also agrees to handle all of the member employers’ workers’ compensation claims, including the investigation of the claims, the negotiation of settlements, and the retention and supervision of an attorney necessary for the prosecution or defense of litigation arising from any claim. In exchange for these services, the member employers pay MCSIG premiums.
General Laws c. 152, §25A contemplated that workers’ compensation self-insurance groups would serve as an alternative to an employer’s purchasing its own insurance from an insurance company that would likely be subject to the provisions of G.L.c. 175 and its regulations, and MCSIG’s structure is consistent with this contemplated limited role.
B. G.L.c. 175D
General Laws c. 175D, governing the Fund, defines an insurer as “any person . . . who (a) writes any kind of insurance to which [G.L.c. 175D] applies, including the exchange of reciprocal or interinsurance contracts, and (b) is licensed to transact insurance in the Commonwealth.” G.L.c. 175D, §1(5). The “kind of insurance to which [G.L.c. 175D] applies,” as noted above, is “all kinds of direct insurance” with exceptions not applicable to this case. G.L.c. 175D, §2.[17] The definition of “insurer” in §1(5) applies throughout G.L.c. 175D “unless the context clearly requires otherwise . . .” G.L.c. 175D, §1. “Expansion of the explicit definition of the word ‘insurer’ may be justified only when, and to the extent that, the context of the statute clearly requires such expansion in order that the statute be internally consistent and consistent with the obvious legislative objective in enacting it.” Ulwick v. Massachusetts Insurers Insolvency Fund, 418 Mass. 486, 489 (1994).
The Fund itself “shall be deemed an insurer for purposes of examination and regulation by the commissioner” of insurance. G.L.c. 175D, §10. That provision notwithstanding, however, the “Fund is not an insurer.” Pilon’s Case, 69 Mass.App.Ct. at 172. Moreover, no separate regulations correspond to G.L.c. 175D, and G.L.c. 175D itself never refers to G.L.c. 175. These omissions suggest that, like workers’ compensation self-insurance groups under G.L.c. 152, the Fund exists separate from, though parallel to, the insurance laws and regulations.[18]
C. G.L.c. 152 and G.L.c. 175D
As noted, resolution of the parties’ dispute requires the court to determine the manner in which these two statutes intersect. Under the Act, a workers’ compensation self-insurance group is an insurer, and while it is not subject to the insurance laws or regulations, many provisions in G.L.c. 152 parallel those in the insurance laws. E.g., G.L.c. 152, §§25E, 25F, 25G, 250. The Fund views an insurer as an entity that writes any kind of insurance, including workers’ compensation insurance, and that is licensed to transact insurance business in Massachusetts. G.L.c. 175D, §1(5).[19] Both G.L.c. 152 and G.L.c. 175D permit the expansion of their definitions of insurer where the context of the respective statute clearly requires it. G.L.c. 152, §1; G.L.c. 175D, §1; see, e.g. Ulwick, 418 Mass. at 489. The context of both statutes supports the conclusion that MCSIG is an insurer such that the Gorski claim is not a covered claim under the Fund.
In rationalizing the prohibition of insurers from benefiting from Fund payments, the Appeals Court has held that the “design of the Fund [is] to indemnify injured persons, but not the insurance industry.” Dufresne’s Case, 51 Mass.App.Ct. 81, 83 n.5 (2001) (alteration in original), quoting Ferrari v. Toto, 9 Mass.App.Ct. 483, 487 (1980), S.C., 383 Mass. 36 (1981). Additionally, to the extent an insured seeking payment from the Fund has already received workers’ compensation benefits, the Fund’s obligation does not include “a claim for compensation or other benefits which arises out of and is within the coverage of a workers’ compensation policy . . .” G.L.c. 175D, §5(1)(a). The intersection of this provision with G.L.c. 152, §15, is the context in which Massachusetts appellate courts have considered the Fund and the Act simultaneously. While this context is distinguishable, the reasoning in these cases provides guidance.
Section 15 of G.L.c. 152 “provides in relevant part that, when an employee is injured in the course of his employment, he not only is entitled to workers’ compensation but he may also bring a tort action against responsible third parties.” Gaeta v. National Fire Ins. Co. of Hartford, 410 Mass. 592, 593 (1991). “The sum recovered shall be for the benefit of the [workers’ compensation] insurer, unless such sum is greater than that paid by it to the employee, in which event the excess shall be retained by or paid to the employee.” Id. (alteration in original), quoting G.L.c. 152, §15. “The purpose of this provision is to prevent double recovery by the employee, that is, ‘once by way of compensation and once by way of damages.’ ” CNA Ins. Cos., Inc. v. Semedo-Anacleto, 39 Mass.App.Ct. 271, *136 274 (1995), quoting McDonald v. Employers’ Liab. Assur. Corp., Ltd., 288 Mass. 170, 174 (1934).
In CNA Ins. Cos., Inc., the employer’s workers’ compensation carrier paid workers’ compensation benefits to the injured employee. Id. at 272. Thereafter, the employee commenced a negligence action against the tortfeasor; prior to trial, the tortfeasor’s insurer became insolvent, and the Fund took over its obligation. Id. The employee, the tortfeasor, and the Fund eventually settled; the Fund paid “the difference between ... the Fund’s statutory maximum, and . .. the amount of the workers’ compensation payments.” Id. at 272-73. Relying on G.L.c. 175D, §1(2), and G.L.c. 175D, §5(1)(a), the Appeals Court held that the Fund properly subtracted the amount the employee had already received as workers’ compensation benefits becauseG.L.c. 175D, §1(2), prohibited reimbursement to the workers’ compensation insurer pursuant to G.L.c. 152, §15, as an amount to an insurer. Id. at 275.[20]
The court pointed out that if the tortfeasor’s insurer were not insolvent, the employee would have to reimburse the workers’ compensation insurer pursuant to G.L.c. 152, §15, thereby placing the employee “in no better position than” with the Fund’s paying a portion of the employee’s settlement. Id. That the workers’ compensation insurer “sustain(ed) a loss as a result of [the court’s] conclusion” was consistent with the purposes of G.L.c. 152, §5, “to prevent double recovery,” and of G.L.c. 175D, “to indemnify injured persons.” Id. at 275, 276 (citation omitted). Thus, even where the Act explicitly provides for compensation, the exclusions in G.L.c. 175D relieve the Fund of the requirement to make payments on the balance of a claim that is only partially “covered” under G.L.c. 175D.
While consistent with and concerning the same provision of G.L.c. 175D as CNA Ins. Cos., Inc., the facts in California Plant Protection, Inc. v. Zayre Corp., 39 Mass.App.Ct. 627 (1996), and Ulwick, 418 Mass. 486 (1994), are closer to the issue before this court. In California Plant Protection, Inc., an injured employee brought a personal injury action against the plaintiff, a corporation that provided guard services to the employee’s employer. 39 Mass.App.Ct. at 628. The plaintiff corporation filed a third-party complaint for indemnification against the employer pursuant to their contract. Id. The plaintiff and its insurer had previously “agreed that claims under the policy were ‘to be handled as if the policy had been written on a formal self-insured basis.’ . . . Under this arrangement, [the plaintiffs insurer] was not obligated to bear any expense ... of any suit unless and until the amounts paid exceeded” the self-insured retained limits. Id. at 628-29.
After the plaintiff filed suit, the employer’s general liability insurer was adjudged insolvent. Id. The “critical issue” was whether the plaintiff, which was self-insured up to a certain amount, was “an ‘insurer’ within the meaning of G.L.c. 175D. If it [were], it [could] not proceed against [the employer] as the insured of an insolvent insurer.” Id. at 630. If it were not an insurer, “the Fund [would] be required to pay” the plaintiff. Id. The Appeals Court relied on Ulwick for its decision that the self-insured plaintiff was not an insurer. Id. at 630-32.
In Ulwick, after sustaining an injury in the course of his employment, the injured employee received payments from his employer, a municipality, for medical bills and lost wages pursuant to G.L.c. 41, §100 and §11 IF, respectively. 418 Mass. at 487. The employee commenced an action against the tortfeasors and their insurer; their insurer’s subsequent insolvency triggered the Fund’s involvement. Id. at 487-88. Similar to G.L.c. 152, §15, G.L.c. 41, §§100 and 111F both provide that “where ... a police officer is injured in circumstances entitling him under those sections to compensation from his municipal employer and a third person is liable for the injury, the municipal employer shall be entitled to reimbursement from any recovery.” Id. at 489. The Fund argued that the court should treat the municipal employer as an insurer and subtract from the amount due to the employee that amount the employer had already paid. Id. at 488-89, citing G.L.c. 175D, §1(2).
As the employer did not fit within the definition of insurer set forth in G.L.c. 175D, §1(5), the court was “not free to treat [the employer] as an insurer . . . wiless the context of G.L.c. 175D, §1(2), ‘clearly require[d]’ [the court] to do so . . .” Id. at 489 (emphasis added). The context clearly requires such expansion when it would result in the statute’s being “internally consistent and consistent with the obvious legislative objective in enacting it.” Id. “The obvious legislative purpose in establishing the Fund, which is funded by the insurance industry, is to benefit members of the public, individuals and entities, including municipal employers . . . which are outside the insurance industry, from losses due to the insolvency of a member of that industry.” Id. at 490-91. As the injured employee’s employer in Ulwickw&s not a member of the insurance industry, the court declined to treat it “as an insurerf ] in order that [it] not benefit from the Fund when a member of the insurance industry has been declared insolvent.” Id. at 490.
Relying on Ulwick, the Appeals Court in California Plant Protection, Inc., held that the plaintiff was not an insurer. 39 Mass.App.Ct. at 631. That the plaintiff was “self-insured’ [was] merely a manner of speaking. ‘Self-insurance’ is neither a business nor a business transaction. It is a shorthand business expression which refers to a financial decision not to be insured — a decision that may be promoted as much by a shortage of funds as it is by shrewdness or self-confidence.” Id. at 632. The plaintiffs status as a self-insurer that did not insure certain risks was a “private decision . . . *137 [that was] not subject to legislative regulation and affecifed] no one but itself.'’ Id. at 631 (emphasis added). Thus, the plaintiff was not “a member or segment of the insurance industry.’’ Id. “Members of the insurance industry are those who are in the business of insurance. The business of a member of the industry is ‘subject to a large degree of legislative regulation.’ ” Id. (footnote and citation omitted). Instead, the plaintiff was “in the business of providing guard services and [was] ‘outside the insurance industry.’ ’’ Id.
An entity is still considered to be within the insurance industry even if it does not pay into the Fund. See G.L.c. 175D, §3 (providing that Fund is “a nonprofit unincorporated legal entity to be known as the Massachusetts Insurers Insolvency Fund consisting of all insurers”); G.L.c. 175D, §5(l)(c) (authorizing Fund to “assess insurers the amounts necessary to pay the obligations of the Fund and the expenses of handling covered claims subsequent to an insolvency”). In Ferrari, which California Plant Protection, Inc., and Ulwick also relied on, the injured employee received workers’ compensation benefits from his employer’s workers’ compensation insurer. 9 Mass.App.Ct. at 484. The employee brought an action against the tortfeasor whose insurer was “subsequently adjudged insolvent . . . [and] [a]s a consequence . . . the Fund became potentially liable for claims against the policies issued by that company . . ."Id. The Fund denied liability on the ground that the employee “had already recovered [workers’] compensation benefits in excess of the limits of’ the tortfeasor’s policy; thus, pursuant to G.L.c. 152, §15, and in violation of G.L.c. 175D, §1(2), the employee “would retain nothing of what [he] might recover” from the Fund because “anything [he] recovered would redound to the benefit of the [workers’] compensation insurer.” Id. at 484-85.
At the time the Appeals Court decided Ferrari, G.L.c. 175D “except[ed] from participation in the Fund” workers’ compensation insurance. Id. at 485, citing G.L.c. 175D, §2 (1970). The employer’s workers’ compensation insurer was therefore not a member of the Fund. Id. The issue before the court was “whether the exclusion of amounts due an insurer from claims for which the Fund must pay [G.L.c. 175D, §1(2)] is limited to Fund member insurers or whether ‘the context clearly requires otherwise’ and the exclusion extends to segments of the insurance industry which are not participants in the Fund.” Id. at 485-86. The Appeals Court held that “the class referred to in the [G.L.c. 175D, §1(2)] exclusion provision must, in context, mean something more, i.e., insurers beyond member insurers." Id. at 486 (emphases added). In reaching this decision, the court considered the language in G.L.c. 175D, §1(2): “any amount due any reinsurer, insurer, insurance pool, or underwriting association.” Id. (emphasis added).
Here, the context of G.L.c. 175D clearly requires the conclusion that the definition of insurer in G.L.c. 175D, §1(2), includes MCSIG. The inclusion of MCSIG in the Fund’s scope is consistent with the purpose of the Legislature’s objective in enacting the Fund, and reading G.L.c. 175D in concert with G.L.c. 152, as this court must, provides further support for this conclusion. First, the purpose of the Fund is “to indemnify injured persons!,]” CNA Ins. Cos., Inc., 39 Mass.App.Ct. at 275, quoting Ferrari, 9 Mass.App.Ct. at 487, which are not “member[s] or segment[s] of the insurance industry.” California Plant Protection, Inc., 39 Mass.App.Ct. at 631. To that end, the Fund excludes from the claims it covers “any amount due . . . [an] insurer,” G.L.c. 175D, §1(2), which it defines as “any person . . . who (a) writes any kind of insurance . . ., and (b) is licensed to transact insurance in the Commonwealth.” G.L.c. 175D, §1(7) (emphases added); see G.L.c. 4, §7, twenly-third (defining “person” as used in statutes, as “includ[ing] corporations, societies, associations and partnerships”).
Second, G.L.c. 152 considers MCSIG to be an insurer. The Legislature created workers’ compensation self-insurance groups solely for the purpose of providing workers’ compensation benefits, and as an alternative to employers’ purchasing insurance on their own. Such groups are insurers, but, because of their limited purpose, they are not subject to the extensive provisions of G.L.c. 175 and its regulations. See G.L.c. 152, §25E. Instead, G.L.c. 152 still subjects workers’ compensation self-insurance groups “to legislative regulation!,]” California Plant Protection, Inc., 39 Mass.App.Ct. at 631, by placing the groups within the Commissioner of Insurance’s purview, and by imposing on the groups requirements similar to those in G.L.c. 175. See, e.g., G.L.c. 152, §§25F, 25G, 250.
Third, MCSIG’s relationship with its member employers demonstrates that MCSIG has taken on the role of their workers’ compensation insurer. MCSIG handles its member employers’ workers’ compensation claims by investigating the claims, negotiating the settlements for the claims, hiring and supervising legal counsel when necessary to prosecute or defend against a claim, and paying workers’ compensation benefits. In exchange, the member employers pay MCSIG premiums.[21] Contrast Morrison v. Toys “R” Us, Inc., Mass., 441 Mass. 451, 455 (2004) (holding self-insuring corporate entity was not engaged in business of insurance as it “had no contractual obligation to settle [its employee’s] [negligence] claim [against it] and [was] not otherwise regulated by the Commonwealth for insurance activities”).
Fourth, even though the statute expressly relieves MCSIG from insurance laws and regulations, MCSIG cannot “act as a worker’s compensation self-insurance group unless it has been issued a certificate of approval by the commissioner of insurance.” G.L.c. 152, §25F. Thus, while it is not precisely “licensed to trans *138 act insurance!,]” G.L.c. 175D, §1(2), it is authorized through its certificate of approval to “contract! ] with an employer to pay the compensation provided for by" the Act. G.L.c. 152, §1(7). MCSIG is therefore in the business of providing workers’ compensation insurance to its member employers. See California Plant Protection, Inc., 39 Mass.App.Ct. at 631.
Fifth, workers’ compensation self-insurance groups are “member[s] of the [insurance] industry... ‘subject to a large degree of legislative regulation!,]’ ” id. (citation omitted), but they are not required to pay into the Fund. The absence of this requirement from G.L.c. 152, however, does not preclude MCSIG from being an insurer under the Fund. See Ferrari, 9 Mass.App.Ct. at 486. The exclusion of insurers from Fund payments “in context, mean[s] something more, i.e., insurers beyond member insurers.” Id.
Finally, “[t]he statutory limitation on the . . . Fund’s obligation minimizes the financial burden on the insurance-buying public and conserves the... Fund’s limited resources.” Pilon's Case, 69 Mass.App.Ct. at 172. In the same way that “[insurers recoup the amounts which they pay into the [F]und by increasing their rates and premiums . . . [such that] [t]he cost of paying claims against insolvent insurers ‘is ... ultimately passed on to the insurance-buying public!,]’ ” Clark Equip. Co. v. Massachusetts Insurers Insolvency Fund, 423 Mass. 165, 167 (1996) (internal citations omitted), quoting Massachusetts Motor Vehicle Reinsurance Facility v. Commissioner of Ins., 379 Mass. 527, 530 (1980), so too may workers’ compensation self-insurance groups raise the premiums they charge their member employers to make up for the “loss” allegedly suffered from its exclusion from the Fund. See G.L.c. 152, §250(3) (permitting workers’ compensation self-insurance group to “apply to the commissioner of insurance for authority to make its own rates” used in determining member employers’ premium contributions to group); G.L.c. 152, §25R (“If the assets of a group are at any time insufficient to enable the group to discharge its legal liabilities and other obligations and to maintain the reserves required of it under [G.L.c. 152], it shall forthwith make up the deficiency or levy an assessment on its members for the amount needed to make up the deficiency”). As the Supreme Judicial Court has previously held, G.L.c. 175D “simply says that, as between [a] workers’] compensation insurer and the Fund, the loss must be absorbed by the workers’] compensation insurer.” Ferrari, 383 Mass. at 38, affirming 9 Mass.App.Ct. 483 (1980).
MCSIG is therefore an insurer within the definition in G.L.c. 175D, §1(2). Accordingly, as the Gorski claim represents “any amount due . . . [an] insurer,” it is not a “covered claim!,]” and MCSIG is not entitled to payment from the Fund. The Fund’ motion for summary judgment is ALLOWED.[22]
II. Direct Insurance
The court’s conclusion, above, that MCSIG is an insurer is dispositive of the parties’ motions. That notwithstanding, the court notes that neither of the Reliance Policies provides direct insurance. General Laws c. 175D applies “to all kinds of direct insurance!,]” including workers’ compensation insurance. G.L.c. 175D, §2. Neither the statute nor Massachusetts case law defines “direct insurance.” “Words that are not defined in a statute should be given their usual and accepted meanings, provided that those meanings are consistent with the statutory purpose.” Seideman v. Newton, 452 Mass. 472, 477-78 (2008). The court “derive[s] the words’ usual and accepted meanings from sources presumably known to the statute’s en-actors, such as their use in other legal contexts and dictionary definitions.” Id. at 478, quoting Commonwealth v. Zone Book, Inc., 372 Mass. 366, 369 (1977).
“Direct insurance” does not appear in Black’s Law Dictionary as a phrase; rather, it defines each term separately. “Direct” is “straight; undeviating . . . [f]ree from extraneous influence; immediate . . .” Black’s Law Dictionary 491 (8th ed. 2004); see Webster’s II New College Dictionary 321 (1999) (defining “direct” as “!p]roceeding or lying in a straight course or line . . . [w]ith nothing intervening”). “Insurance” is “[a] contract by which one party (the insurer) undertakes to indemnify another party (the insured) against risk of loss, damage, or liability arising from the occurrence of specified contingency ... An insured party usu[ally] pays a premium to the insurer in exchange for the insurer’s assumption of the insured’s risk.” Black’s Law Dictionary 814 (8th ed. 2004); see Webster’s II New College Dictionary 321 (1999) (defining “insurance” as “[contractual coverage binding a party to indemnify another against specified loss in return for premiums paid”).
Based on these definitions, “direct insurance” is coverage for a loss without any interruption; its connection to the insured is immediate and does not operate through any other coverage. See Black’s Law Dictionary 491; see also Zinke-Smith, Inc. v. Florida Ins. Guar. Ass’n, Inc., 304 So.2d 507, 508 (Fla. Dist. Ct. 1974) (defining “direct insurance” in similar context as “insurance contract between the insured and the insurer which has accepted the risk of a designated loss to such insured, which relationship is direct and uninterrupted by the presence of another insurer”). This meaning is in direct contrast with the dictionary definition of “excess insurance”: “[a]n agreement to indemnify against any loss that exceeds the amount of coverage under another policyl,]’’ Black’s Law Dictionary 816 (8th ed. 2004) (emphasis added), and is consistent with the definition of “primary insurance”: “(¿insurance that attaches immediately on the happening of a loss; insurance that is not contingent on the exhaustion of an underlying policy.” Black’s Law Dictionary 818 (8th ed. 2004) (emphases added).[23] “[A]nother policy” serves as an interruption between the insurer and the insured’s loss, thus excess insurance is not direct insurance or primary insurance.
*139 The meaning of direct insurance also conflicts with Massachusetts’ view of “reinsurance:” “a contractual arrangement whereby one insurer (the ceding insurer) transfers all or a portion of the risk it underwrites pursuant to a policy or group of polices to another (the reinsurer).” Commerce Ins. Co. v. Commissioner of Ins., 447 Mass. 478, 490 (2006), quoting 2 B.R. Ostrager & T.R. Newman, Insurance Coverage Disputes §15.01 [a] (13th ed. 2006); see Black’s Law Dictionary 1312 (8th ed. 2004) (defining reinsurance as “(i)nsurance of all or part of one insurer’s risk by a second insurer, who accepts the risk in exchange for a percentage of the original premium”). The reinsured’s own assumption of the risk interrupts the reinsurer’s connection to the reinsured, thus reinsurance is not direct insurance.[24]
The losses MCSIG contracts to cover are the workers’ compensation benefits its member employers must pay, and MCSIG agrees to pay $250,000 of those benefits, per occurrence, itself. Coverage under both Reliance Policies is triggered only once MCSIG has paid $250,000 of its loss. Thus, regardless of whether the Reliance Policies are characterized as excess insurance or reinsurance, their coverage of MCSIG’s losses is not direct because the $250,000, or the risk MCSIG has assumed itself, interrupts any coverage that the Reliance Policies may provide, thereby attenuating Reliance’s connection with MCSIG. The Reliance Polices are accordingly not within the Fund’s scope.
III. Declarations
MCSIG’s complaint is one for declaratory relief, thus “the [Superior] Court judge [is] required to make a declaration of the rights of the parties.” Vergato v. Commercial Union Ins. Co., 50 Mass.App.Ct. 824, 829 (1996) (first alteration in original), quoting Dupont v. Dracut, 41 Mass.App.Ct. 293, 297 (1996). Based on the analysis in this opinion, the court makes the following declarations:
1. The Gorski claim is not a covered claim; and
2. The Fund is not required to pay the Gorski claim or any future amounts incurred thereunder to MCSIG.
ORDER
For the foregoing reasons, the Fund’s motion for summary judgment is ALLOWED and MCSIG’s motion for partial summary judgment is DENIED. The court makes the declarations set out in Section in of this opinion.

At the time the Commissioner of Insurance approved MCSIG’s application for a certificate of approval to be a workers’ compensation self-insurance group in October 1990, the Commissioner recognized five member employers, although MCSIG’s application listed nine. See G.L.c. 152, §§25F, 25G.

The title page of this document included as Exhibit 1 to Gregory P. Deschenes’ affidavit in support of the Fund’s opposition to MCSIG’s summary judgment motion indicates that its title is “Massachusetts Workers’ Compensation Certificate” while the document’s table of contents states that the title is “Workers’ Compensation and Employers’ Liability Coverage Certificate[.]”

Section 250 of G.L.c. 152 permits workers’ compensation self-insurance groups to seek approval from the Commissioner of Insurance to reduce “premium contributions ... by an advance premium discount reflecting the group’s levels and loss experience.” G.L.c. 250(2). In November 2003, Mill-man USA provided MCSIG with a report that MCSIG requested to “determin[e] if advanced premium discounts [were] indicated for program year 2004.” Millman Report, at 4. Within this report, Millman USA described MCSIG as “a group of Massachusetts nursing homes that have pooled together in order to insure their Massachusetts workers compensation exposures.” Millman Report, at 3 (emphasis added). Millman prepared similar reports for MCSIG in September 2005, October 2007, and October 2008, all of which contained an identical description of MCSIG.

This section of the Indemnity Agreement is essentially the same as section 3.19 of MCSIG’s By-Laws, titled “Indemnification.”

MCSIG’s current administrator is First Cardinal LLC; its predecessor was ManagedComp, Inc.

In MCSIG’s financial records for 1990 through 1995, included as part of the Fund’s summary judgment submissions, MCSIG lists “Reinsurance” among its expenses, paying $311,155 for it in 1995. See G.L.c. 152, §251.

During the time period Reliance insured MCSIG, Midwest Employers Casualty Company was Reliance’s retro-cessionaire, i.e., it insured Reliance.

In other words, as the Insuring Agreements section of the Specific Policy explains, MCSIG would “retain as its own retention in the amount stated [above] and [the Stock Insurance Company, i.e., the insurer] . . . [would] indemnify [MCSIG] against loss in excess of such retention, subject to the limit of indemnity . . .” Specific Policy, Insuring Agreements, §11; see infra n.10. The Specific Policy defined “loss” as “only such amounts as are actually paid in cash by the insured in payment of benefits under the workers’ compensation law, in settlement of claims or in satisfaction of awards of judgments ...” Specific Policy, Insuring Agreements, §TV(G).

The Specific Policy defined “annual aggregate” as “the maximum amount [Reliance] will be liable for losses occurring during the Policy Period." Specific Policy, Endorsement #2, §4(B).

The copy of the Specific Policy that MCSIG included with its summary judgment submission did not include the Insuring Agreements, the Exclusions, or the Conditions, although it has submitted Endorsements to the Specific Policy which amend some — but not all — of the sections within those provisions.

The “ultimate net loss” also included “claim-specific declaratory judgment expenses” which the Agreement, in turn, defined as “expenses incurred in actions brought to determine [MCSIG’s] defense and/or indemnification obligations for individual claims presented against policies covered under this [Holbom Policy].”

The Holbom Policy uses the term “the Company” where this court has inserted MCSIG. The Policy does not define the term “Company” in the Cover Note or Holbom Agreement, although the Cover Note does identify MCSIG as the “Reinsured Company.” Conversely, the Specific Policy defines “Company” as “A Stock Insurance Group” that issued the policy.

For example, according to the Certificate, MCSIG’s manual premium for one of MCSIG’s member employers during the period of January 1, 2002, through January 1, 2003, was $89,260. Certificate, at 5. Additionally, according to MCSIG’s financial statements, included as part of the Fund’s summary judgment submission, MCSIG’s total manual premium in 1995 was $5,185,921.

The statute does exclude certain kinds of insurance, such as life insurance and title insurance. Id. The exclusions are not relevant to this case.

Thls definition also states that a workers’ compensation self-insurance group is not an insurer “where used in sections sixty-five A and sixty-five C” of G.L.c. 152, permitting the Commissioner of Insurance to designate an insurer to provide a workers’ compensation insurance policy to an employer who has been rejected by another insurer. Id.

“Regulations may not be interpreted in a way that produces a result which is contrary to the plain language of the statute and its underlying purpose.” TBI, Inc. v. Board of Health of N. Andover, 431 Mass. 9, 13 (2000). This interpretation of 211 Code Mass. Regs. §67.03(1) is consistent with G.L.c. 152, as the analysis of G.L.c. 152, §1(7), above, demonstrates.

When G.L.c. 175D was first enacted, it excluded “workmen’s compensation . . . insurance.” St. 1970, c. 261, §1. The Legislature deleted that phrase with St. 1988, c. 302, §1. In fact, with St. 1992, c. 318, §3, the Legislature expressly provided that G.L.c. 175D “shall apply to all claims for compensation or other benefits which arise out of and are within the coverage of a workers’ compensation policy, which have been filed with the Massachusetts Insurers Insolvency Fund after January first, nineteen hundred and nineiy-one." See Historical and Statutory Notes to G.L.c. 175D, §5 (noting “St.1992, c. 318, was approved Jan. 5, 1993. Emergency declaration by the Governor was filed Jan. 6, 1993”). The Legislature thus considered the interaction between G.L.c. 152 and G.L.c. 175D and did not make an express provision for workers’ compensation self-insurance groups. See, e.g., St. 1992, c. 318, §4 (amending G.L.c. 152, §25A, within same chapter — St. 1992, c. 318 — as amendments to G.L.c. 175D).

General Laws c. 175D also sets forth a series of provisions concerning the Commissioner of Insurance’s connection to the Fund. See, e.g., G.L.c. 175D, §4 (“The members of the [Fund’s] board shall be nominated by members of the Fund subject to the approval of the commissioner [of insurance]; provided, however, that at least one member of the board shall be appointed by the commissioner as a representative of insurance producers"); G.L.c. 175D, §5(l)(f) (authorizing Fund to “handle claims . . . through one or more insurers designated as servicing facilities . . . [which designation] is subject to the approval of the commissioner” of insurance); G.L.c. 175D, §5(2)(e) (permitting Fund to “request that the commissioner [of insurance] order an examination of any insurer ... [if] such insurer may be in a financial condition hazardous to the policyholders or the public”); G.L.c. 175D, §5(2)(f) (‘The Fund may . . . make reports and recommendations to the commissioner [of insurance] upon any matter germane to the solvency, liquidation, rehabilitation or conservation of any insurer”); G.L.c. 175D, §6(1)(a) (“The FUnd shall. . . submit to the commissioner a plan of operation . . . [which] shall become effective as approved in writing by the commissioner”); G.L.c. 175D, §7 (setting forth powers and duties of commissioner of insurance).
Interestingly, the text of G.L.c. 175 refers to the Fund in limited contexts; in G.L.c. 175, §168, providing that if a special insurance broker negotiates with a foreign company not authorized to transact business in Massachusetts, the broker must, inter alia, submit an affidavit to the Commissioner of Insurance containing certain information unless the transaction is with “an exempt commercial risk or policyholder as defined in section 224 [of G.L.c. 175]” and that entity “acknowledges in writing its understanding, that ... in the event of [its] insolvency ... a loss shall not be paid by the Massachusetts Insurers Insolvency Fund[;]” in G.L.c. 175, §180C, requiring the receiver of an insolvent insurer to apply to the Supreme Judicial Court “for approval of a proposal to disburse assets out of such company’s marshalled assets from time to time as such assets become available, to the Massachusetts Insurers Insolvency Fund,” and other organizations; and in G.L.c. 175, §180F, placing “claims presented by the Massachusetts Insurers Insolvency Fund” and other organizations second in the “order of distribution of claims” from the general assets of an insolvent insurer.

As noted above, G.L.c. 175D, §10, states that the Fund “shall be deemed an insurer for purposes of examination and regulation by the commissioner” of insurance. Other than through G.L.c. 175D, §5(l)(b), by which the Fund is “deemed the insurer to the extent of its obligation on the covered claims and ... [has] all rights, duties and obligations of the insolvent insurer to such an extent!,]” the Fund itself does not fall within its own definition of insurer.

The tortfeasor also paid a portion of the employee’s settlement amount. Id. at 272. The workers’ compensation insurer argued that it could therefore be “reimbursed independent of the money paid to the Fund.” Id. at 275. The tortfeasor, however, was the insured of the insolvent insurer, and G.L.c. 175D, §1(2), provides “that ‘in no event’ may any claim for any amount due an insurer be ‘asserted against the insured of such insolvent insurer.’ ” Id., quoting G.L.c. 175D, §1(2). On this basis, the Appeals Court distinguished Gaeta, where the workers’ “compensation insurer could be reimbursed in full from the contribution to the settlement made by a party other than the insured of the insolvent insurer.” Id. (emphasis added), citing Gaeta, 410 Mass. at 595.

To the extent MCSIG argues that the member employers’ agreement in the Indemnity Agreement to “be jointly and severally liable for the workers’ compensation and employers’ liability obligations of [MCSIG] and its” member employers weighs against finding that MCSIG is an insurer, this argument fails. The individual member employers do not retain their own risks. The agreement still shifts the liabilities of each individual member employer to the group and is therefore consistent with the idea that insurance involves the transfer of one party’s risk to another. Cf. Associated Indus. of Ky., Inc. v. United States Liab. Ins. Group, 531 F.3d 462, 467 (6th Cir. 2008) (holding that “entire [workers’ compensation self-insurance] group is responsible for[ ] the collective liabilities of each individual participant, and this arrangement is still risk shifting among participants” and therefore insurance).

The parties have cited to non-Massachusetts cases in support of their arguments. See, e.g., Maryland Motor Truck Ass'n Workers' Comp. Self-Insurance Group v. Property & Cas. Ins. Guar. Corp., 386 Md. 88, 103 (2005) (holding workers’ compensation self-insurance group was insurer); South Carolina Prop. & Cas. Ins. Guar. Ass'n v. Carolinas Roofing & Sheet Metal Contractors Self-Insurance Fund, 315 S.C. 555, 559 (1994) (holding workers’ compensation self-insurance group was insurer); Iowa Contractors Workers’ Comp. Group v. Iowa Ins. Guar. Fund, 437 N.W.2d 909, 917 (Iowa 1989) (holding workers’ compensation self-insurance group was not insurer). Although the situations before those courts are analogous to this case, and while this court found reading the analysis in those cases helpful in framing the issues, the differences in the applicable statutes and insurance contracts coupled with each state court’s varying view of insurance law weigh against utilizing those cases as persuasive authority. Statutory interpretation and Massachusetts precedent is sufficient to enable this court to reach its decision.

Within each of the citations to excess insurance and primary insurance, Black’s Law Dictionary cites to the other word using “Cf.” which it “use[s] to refer to related but contrastable terms.” Black’s Law Dictionary xxii (8th ed. 2004).

That notwithstanding, G.L.c. 175D also specifically excludes reinsurance from covered claims. G.L.c. 175D, §1(2) (stating that “covered claims" do not include “any amount due a reinsurer ... or underwriting association”); see Commerce Ins. Co., 447 Mass. at 490 (defining “reinsurance”).